**CHAMBERS v. TRANSIT MGMT.**

[360 N.C. 609 (2006)]

HUBERT CHAMBERS, Employee v. TRANSIT MANAGEMENT, Employer, SELF INSURED (COMPENSATION CLAIMS SOLUTIONS, Servicing Agent)

No. 527A05

(Filed 17 November 2006)

**Workers' Compensation— occupational disease—specific traumatic event**

The Industrial Commission erred in a workers' compensation case by concluding that plaintiff employee bus driver's ulnar nerve entrapment neuropathy and cervical spine condition were compensable occupational diseases and that the injury to the cervical spine qualified as a specific traumatic incident, and the case is remanded for further proceedings consistent with this opinion, because: (1) the Commission applied an incorrect legal standard in finding plaintiff's ulnar neuropathy and cervical spine condition to be compensable occupational diseases pursuant to N.C.G.S. § 97-53(13) and the cervical spine condition to be a specific traumatic incident pursuant to N.C.G.S. § 97-2(6); (2) plaintiff failed to establish that his employment placed him at a greater risk of contracting either his ulnar nerve entrapment or his cervical spine condition than the general public; and (3) the evidence is not sufficient to satisfy the requirements enunciated by the General Assembly in N.C.G.S. § 97-2(6) that a specific traumatic incident occurred when plaintiff presented evidence that he experienced pain on a particular date but he presented no evidence linking that pain to the occurrence of an injury, and none of plaintiff's evidence establishes a specific traumatic incident of the work assigned that can be construed as an injury by accident to plaintiff's back.

Justice MARTIN did not participate in the consideration or decision of this case.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 172 N.C. App. 540, 616 S.E.2d 372 (2005), affirming an opinion and award filed 3 February 2004 by the North Carolina Industrial Commission. On 3 November 2005, the Supreme Court allowed defendant's petition for discretionary review as to additional issues. Heard in the Supreme Court 14 March 2006.

*Sellers, Hinshaw, Ayers, Dortch & Lyons, P.A., by Robert A. Whitlow and John F. Ayers III, for plaintiff-appellee.*

*Smith Law Firm, P.C., by John Brem Smith; and Hedrick Eatman Gardner & Kincheloe, LLP, by Jennifer Ingram Mitchell and M. Duane Jones, for defendant-appellant.*

*Samuel A. Scudder, S. Neal Camak, George W. Lennon, and Charles R. Hassell, Jr., Counsel for the North Carolina Academy of Trial Lawyers, amicus curiae.*

PARKER, Chief Justice.

This case arises from proceedings before the North Carolina Industrial Commission (the Commission) and raises the issues of whether the Court of Appeals erred in affirming the Commission's opinion and award concluding (i) that plaintiff's ulnar neuropathy was a compensable occupational disease pursuant to N.C.G.S. § 97-53(13), (ii) that plaintiff suffered a cervical spine injury as a result of a specific traumatic incident pursuant to N.C.G.S. § 97-2(6), (iii) that plaintiff's cervical spine condition was a compensable occupational disease pursuant to N.C.G.S. § 97-53(13), and (iv) that plaintiff was entitled to continuing disability benefits pursuant to N.C.G.S. § 97-29. Because we determine that the Commission applied an incorrect legal standard in finding plaintiff's ulnar neuropathy and cervical spine condition to be compensable occupational diseases pursuant to N.C.G.S. § 97-53(13) and the cervical spine condition to be a specific traumatic incident pursuant to N.C.G.S. § 97-2(6), we reverse the decision of the Court of Appeals. We do not reach the question whether the Court of Appeals erred in affirming the Commission's award of continuing disability benefits under N.C.G.S. § 97-29.

The record shows that on 4 December 2000 plaintiff was employed by Transit Management of Charlotte (defendant) as a bus driver. Plaintiff had been so employed for approximately thirty years. Plaintiff drove two types of buses, the Flexible bus and the Nova bus; during the course of his routes plaintiff used both hands approximately ninety percent to one hundred percent of the time. On 4 December 2000 plaintiff was assigned a new bus route. At some point during his shift, plaintiff experienced severe pain in his left arm, shoulder, and neck. Plaintiff requested a relief driver approximately six hours into his shift.

Plaintiff did not notify defendant's director of safety and administration until 14 December 2000 and did not file an Employee Injury

**CHAMBERS v. TRANSIT MGMT.**

[360 N.C. 609 (2006)]

and Illness Report until 18 December 2000. Plaintiff initially was unsure whether his conditions were related to his employment or arose from other factors, including yard work. An initial diagnosis stated that plaintiff noted no specific "inciting event" causing injury.

Following visits to his family physician and several orthopedists, plaintiff was referred to Tim E. Adamson, M.D., a neurosurgeon, who diagnosed plaintiff with a "double crush syndrome," which he described as a relationship between two injuries: a left ulnar nerve entrapment affecting the elbow and a cervical spine condition affecting the neck. Dr. Adamson performed two surgeries on plaintiff. Following a functional capacity evaluation indicating plaintiff's level of function at sedentary to light physical demand, Dr. Adamson gave plaintiff a thirty percent permanent partial impairment rating for his left arm.

Plaintiff's claim was heard by Deputy Commissioner Nancy W. Gregory, who filed an opinion and award on 24 February 2003 denying plaintiff's claim for workers' compensation benefits. Plaintiff appealed to the Full Commission, which filed an opinion and award on 3 February 2004 reversing the deputy commissioner and concluding that plaintiff's ulnar nerve entrapment neuropathy and cervical spine condition were compensable occupational diseases and that the injury to the cervical spine qualified as a specific traumatic incident. The Commission also awarded plaintiff continuing disability benefits. The Court of Appeals concluded that the record sufficiently supported the Commission's findings of fact and conclusions of law.

## Standard of Review

The Commission has exclusive original jurisdiction over workers' compensation cases and has the duty to hear evidence and file its award, "together with a statement of the findings of fact, rulings of law, and other matters pertinent to the questions at issue." N.C.G.S. § 97-84 (2005). Appellate review of an award from the Industrial Commission is generally limited to two issues: (i) whether the findings of fact are supported by competent evidence, and (ii) whether the conclusions of law are justified by the findings of fact. *Clark v. Wal-Mart*, 360 N.C. 41, 42-43, 619 S.E.2d 491, 492 (2005) (citing *Hendrix v. Linn-Corriher Corp.*, 317 N.C. 179, 186, 345 S.E.2d 374, 379 (1986)). If the conclusions of the Commission are based upon a deficiency of evidence or misapprehension of the law, the case should be remanded so " 'that the evidence [may] be considered in its true legal light.' " *Id.* at 43, 619 S.E.2d at 492 (quoting *McGill v.*

*Town of Lumberton,* 215 N.C. 752, 754, 3 S.E.2d 324, 326 (1939) (alteration in original)).

## N.C.G.S. § 97-53(13)

Section 97-53(13) defines an occupational disease as: "Any disease . . . which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." N.C.G.S. § 97-53(13) (2005).

For an occupational disease to be compensable under N.C.G.S. § 97-53(13) it must be

(1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [plaintiff's] employment."

*Rutledge v. Tultex Corp./Kings Yarn,* 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983) (quoting *Hansel v. Sherman Textiles,* 304 N.C. 44, 52, 283 S.E.2d 101, 105-06 (1981)) (citing *Booker v. Duke Med. Ctr.,* 297 N.C. 458, 468, 475, 256 S.E.2d 189, 196, 200 (1979)).

This Court stated in *Rutledge*:

To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded.

*Id.* (citing *Booker,* 297 N.C. at 472-75, 256 S.E.2d at 198-200). In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. *Rutledge,* 308 N.C. at 93-94, 301 S.E.2d at 365. "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workman's compensation." *Booker,* 297 N.C. at 475, 256 S.E.2d at 200.

The holding in *Rutledge,* which arose in the context of a claim for chronic obstructive lung disease, *see* 308 N.C. at 87, 301 S.E.2d at 362,

also applies where other diseases are at issue. In *Futrell v. Resinall Corporation* the Court of Appeals applied the *Rutledge* test where a plaintiff contended that he contracted carpal tunnel syndrome as the result of his employment. 151 N.C. App. 456, 458-59, 566 S.E.2d 181, 183 (2002), *aff'd per curiam*, 357 N.C. 158, 579 S.E.2d 269 (2003).

The Court of Appeals correctly noted

there is no authority from this State which allows us to ignore the well-established requirement that a plaintiff seeking to prove an occupational disease show that the employment placed him at a greater risk for *contracting* the condition, even where the condition may have been aggravated but not originally caused by the plaintiff's employment.

*Id.* at 460, 566 S.E.2d at 184. The court explained that

if the first two elements of the *Rutledge* test were meant to be altered or ignored where a [plaintiff] simply argued aggravation or contribution as opposed to contraction, then our courts would not have consistently defined the third element of the *Rutledge* test as being met where the [plaintiff] can establish that the employment caused him to contract the disease, *or* where he can establish that it significantly contributed to or aggravated the disease. *Rutledge* and subsequent case law applying its three-prong test make clear that evidence tending to show that the employment simply aggravated or contributed to the employee's condition goes only to the issue of causation, the third element of the *Rutledge* test. Regardless of how an employee meets the causation prong . . . , the employee must nevertheless satisfy the remaining two prongs of the *Rutledge* test by establishing that the employment placed him at a greater risk for contracting the condition than the general public.

*Id.* (citing *Norris v. Drexel Heritage Furnishings, Inc.*, 139 N.C. App. 620, 622, 534 S.E.2d 259, 261 (2000), *cert. denied*, 353 N.C. 378, 547 S.E.2d 15 (2001); *Hardin v. Motor Panels, Inc.*, 136 N.C. App. 351, 354, 524 S.E.2d 368, 371, *disc. rev. denied*, 351 N.C. 473, 543 S.E.2d 488 (2000)).

In the instant case the Commission applied an incorrect standard of the law when it stated: "Where, as here, there is evidence of both causation and aggravation connected to particular aspects of an employee's job duties . . . to which the general public is not exposed, compensability is logically and legally warranted." The Commission

CHAMBERS v. TRANSIT MGMT.

[360 N.C. 609 (2006)]

cites to this Court's decision in *Walston v. Burlington Industries*; however, the relevant language in *Walston* indicates that a disability caused by disease is compensable when "the disease is an occupational disease, or is aggravated or accelerated by causes and conditions characteristic of and peculiar to [plaintiff's] employment." 304 N.C. 670, 680, 285 S.E.2d 822, 828, *amended on rehearing*, 305 N.C. 296, 285 S.E.2d 822 (1982). In *Walston* this Court concluded that the plaintiff did not prove a causal connection between his diseases and his employment. *Id.* While *Walston* holds that the aggravation of a preexisting condition by an occupational disease is compensable, it does not alter the evidentiary burden that a plaintiff must meet to establish that his employment exposed him to a greater risk of *contracting* his disease relative to the general public.

Based on the record before us, plaintiff has failed to establish that his employment placed him at a greater risk of contracting either his ulnar nerve entrapment or his cervical spine condition than the general public.

In a 20 June 2002 letter to plaintiff's attorney, Dr. Adamson wrote:

2. . . . I feel that [plaintiff's] occupation as a bus driver did place him slightly at higher risk than the general public.

. . .

4. I am not familiar with any study depicting foraminal stenosis or ulnar entrapment neuropathy as direct occupational risks of bus drivers. I believe ulnar entrapment neuropathy is correlated to some degree with repetitive use of the arm and elbow and as a bus driver I would think [plaintiff] would be at risk for this. . . .

5. I am not aware of any particular factors of bus driving that would place [plaintiff] at any greater risk for developing spondylotic disease of the cervical spine and subsequent foraminal stenosis.

6. It is possible that [plaintiff's] job activities did aggravate foraminal stenosis although it is impossible to know this for certain.

. . . I feel that bus driving . . . could be a causative or aggravating factor related to ulnar entrapment neuropathy.

Nowhere in this letter does Dr. Adamson satisfactorily distinguish between the risk faced by plaintiff of *contracting* his conditions and

**CHAMBERS v. TRANSIT MGMT.**

[360 N.C. 609 (2006)]

the risk of *aggravating* a preexisting condition relative to the general public; rather his statement obscures this distinction by suggesting that plaintiff's employment "could be a causative or aggravating factor" relating to his elbow condition. Dr. Adamson's statement in heading 2 does correspond to a question asked by plaintiff's attorney in a 6 June 2002 letter regarding whether "the job duties performed by [plaintiff] place him at increased risk for developing ulnar entrapment neuropathy in the left arm as opposed to this occurring to someone in the general public," but this statement is contradicted by Dr. Adamson's later deposition testimony.

At deposition, plaintiff's attorney asked Dr. Adamson: "Would the type of physical activity [plaintiff] performed in his job as a bus driver . . . place him at an increased risk of either aggravating or developing a left ulnar neuropathy which you diagnosed and treated?" Dr. Adamson responded, "The statement of aggravation of the ulnar neuropathy I believe is very accurate. . . . There is some debate now medically . . . about whether the actual repetitive nature actually causes the entrapment neuropathy, but I think that isn't as clear cut as we would like it to be." Plaintiff's attorney then repeated the question, to which Dr. Adamson responded, "I would believe so, yes." From this testimony alone, it is not clear whether Dr. Adamson believed that plaintiff's employment placed him at a greater risk of *contracting* his condition than the general population.

The ambiguity of Dr. Adamson's testimony on direct was clarified on cross-examination when the following exchange occurred:

Q. . . . I want to make sure I'm clear on what you have indicated, am I correct in understanding that in your opinion, you're not able to say that the bus driving activities caused the ulnar neuropathy, but that it could have aggravated the ulnar neuropathy?

A. I think that's correct.

Q. And the same thing was basically true for the neck condition, the condition as treated there?

A. Sure.

Much of Dr. Adamson's testimony is speculation. Although "[d]octors are trained not to rule out medical possibilities no matter how remote[,]" a "mere possibility has never been legally competent to prove causation." *Holley v. ACTS, Inc.*, 357 N.C. 228, 234, 581

S.E.2d 750, 754 (2003) (citations omitted). To establish the necessary causal relationship for compensation under the Act, "the evidence must be such as to take the case out of the realm of conjecture and remote possibility." *Gilmore v. Hoke Cty. Bd. of Educ.*, 222 N.C. 358, 365, 23 S.E.2d 292, 296 (1942). Dr. Adamson's statements are insufficient to establish the necessary causal relationship for plaintiff's conditions to be compensable as occupational diseases.

The Full Commission relied on Dr. Adamson's testimony in its findings of fact, determining plaintiff's "job duties with defendant caused or aggravated the conditions for which treatment was rendered and that plaintiff's job placed him at an increased risk of developing these conditions." Dr. Adamson made relevant statements on both direct and cross-examination as well as in his correspondence with plaintiff's attorney. The Commission appears to have relied solely on Dr. Adamson's direct examination testimony to the exclusion of his clarifying testimony on cross-examination. Considering Dr. Adamson's testimony on cross-examination, plaintiff produced no evidence that his employment exposed him to a greater risk of contracting an occupational disease relative to the general public.

The Commission's emphatic reliance on the ambiguous portions of Dr. Adamson's testimony, together with its inconsistent statement of the law under *Rutledge*, indicates that the Commission acted under a misapprehension of the law. If Dr. Adamson was ambiguous with respect to plaintiff's risk of contracting his ulnar neuropathy relative to the general public, he was absolutely clear in his 20 June 2002 letter that plaintiff faced no greater risk of contracting his cervical spine condition than did the general public. The Commission incorrectly applied the law and did not rely upon competent evidence in its findings that plaintiff's ulnar neuropathy and spondylotic disease of the cervical spine were compensable occupational diseases. Accordingly, we conclude that the Commission erred in concluding that plaintiff sustained a compensable occupational disease within the meaning of N.C.G.S. § 97-53(13).

## N.C.G.S. § 97-2(6)

The Workers' Compensation Act provides in pertinent part:

"Injury and personal injury" shall mean only injury by accident arising out of and in the course of the employment, and shall not include a disease in any form, except where it results naturally and unavoidably from the accident. With respect to back injuries,

however, where injury to the back arises out of and in the course of the employment and is the direct result of a specific traumatic incident of the work assigned, "injury by accident" shall be construed to include any disabling physical injury to the back arising out of and causally related to such incident.

N.C.G.S. § 97-2(6) (2005).

In the instant case the Commission's findings of fact stated that plaintiff suffered compensable injury and "was unable to return to work because of his occupational disease and specific traumatic incident." The Commission found that "[t]he sudden pain to plaintiff's neck on December 4, 2000, qualifies under North Carolina law as a specific traumatic incident of the work assigned."

The Court of Appeals noted that it is well settled that its review of the Commission's decisions "is limited to the determination of whether there is competent evidence to support the Commission's Findings of Fact and whether those findings support the Conclusions of Law." *Chambers v. Transit Mgmt.*, 172 N.C. App. 540, 542-43, 616 S.E.2d 372, 374 (2005) (citations omitted). In affirming the Commission the Court of Appeals held that the "record contains sufficient evidence to support the facts found by the Commission" and its "conclusion . . . that plaintiff is entitled to disability income as compensation for his injury resulting from a specific traumatic incident." *Id.* at 544, 616 S.E.2d at 375. We disagree.

The plain language of the statute requires that the injury be "the direct result of a specific traumatic incident." N.C.G.S. § 97-2(6). The Commission concluded there was evidence of a specific traumatic incident, but only supported that conclusion by a finding that the "sudden pain to plaintiff's neck on December 4, 2000, qualifies . . . as a specific traumatic incident of the work assigned." Plaintiff, however, described a gradual onset of pain. Daniel B. Murrey, M.D., an orthopedist who treated plaintiff before Dr. Adamson, noted that plaintiff described a "gradual onset of left arm pain while he was driving" and knew of "no particular inciting event." In fact, plaintiff revealed that he might have injured himself doing yard work. Randy Mullenex, director of safety and administration for defendant, testified that he asked plaintiff whether his injury could have resulted from yard work and plaintiff replied, "I don't know." When asked why he believed his job caused or contributed to this flare-up, plaintiff replied, "Because I had no prior problems, none at all with my left arm or my hand or anything of that nature. And—but I

CHAMBERS v. TRANSIT MGMT.

[360 N.C. 609 (2006)]

still couldn't be a hundred percent sure that it wasn't coming from something else."

We conclude that the evidence is not sufficient to satisfy the requirements enunciated by the General Assembly in N.C.G.S. § 97-2(6) and that the Court of Appeals erred in finding that the Commission relied on competent evidence in determining that a specific traumatic incident occurred.

Previous decisions of the Court of Appeals are inconsistent with the holding in *Chambers*. In *Livingston v. James C. Fields & Co.*, 93 N.C. App. 336, 377 S.E.2d 788 (1989) the court addressed a similar situation where an employee experienced a gradual onset of back pain. The court noted that "[a] 'specific traumatic incident' means the 'injury must not have developed gradually but must have occurred at a cognizable time.' *Bradley v. E.B. Sportswear, Inc.*, 77 N.C. App. 450, 452, 335 S.E.2d 52, 53 (1985). In this context, 'cognizable' means capable of being judicially known and determined." *Livingston*, 93 N.C. App. at 337, 377 S.E.2d at 788.

The court expounded on its view of judicially cognizable time in *Fish v. Steelcase, Inc.*, 116 N.C. App. 703, 449 S.E.2d 233 (1994), *cert. denied*, 339 N.C. 737, 454 S.E.2d 650 (1995).

> *Judicially cognizable* does not mean "ascertainable on an exact date." Instead, the term should be read to describe a showing by plaintiff which enables the Industrial Commission to determine when, within a reasonable period, the specific injury occurred. The evidence must show that there was some event that caused the injury, not a gradual deterioration.

*Id.* at 709, 449 S.E.2d at 238. In the instant case no competent evidence in the record supports a finding that plaintiff experienced an event within a judicially cognizable time causing his back injury. Plaintiff must demonstrate a causal connection between the specific traumatic event and the injury. *See Livingston*, 93 N.C. App. at 337, 377 S.E.2d at 789. *Contra Zimmerman v. Eagle Elec. Mfg. Co.*, 147 N.C. App. 748, 754, 556 S.E.2d 678, 681 (2001) (stating that "a worker must only show that the injury occurred at a 'judicially cognizable' point in time"), *disc. rev. improvidently allowed*, 356 N.C. 425, 571 S.E.2d 587 (2002).

Here, plaintiff presented evidence that he experienced pain on a particular date but he presented no evidence linking that pain to the occurrence of an injury. The statute defines an "injury by accident" to

CHAMBERS v. TRANSIT MGMT.

[360 N.C. 609 (2006)]

an employee's back to be an injury that is "the direct result of a specific traumatic incident" and "causally related to such incident." N.C.G.S. § 97-2(6). The onset of plaintiff's pain on 4 December 2000, without more, does not establish evidence of a specific traumatic incident. The Court of Appeals has held that "[t]he onset of pain is not a 'specific traumatic incident' that will determine whether compensation will be allowed pursuant to the act; pain is, rather, as a general rule, the *result* of a 'specific traumatic incident.' " *Roach v. Lupoli Constr. Co.*, 88 N.C. App. 271, 273, 362 S.E.2d 823, 824 (1987).

None of plaintiff's evidence establishes a specific traumatic incident of the work assigned that can be construed as an "injury by accident" to plaintiff's back as required by N.C.G.S. § 97-2(6) and prior decisions of the Court of Appeals. *See, e.g., Moore v. Fed. Express*, 162 N.C. App. 292, 294, 298, 590 S.E.2d 461, 463-64, 465-66 (2004) (loading a box into a vehicle); *Whitfield v. Lab. Corp. of Am.*, 158 N.C. App. 341, 344, 352, 581 S.E.2d 778, 781, 785-86 (2003) (slipped on rainwater); *Ruffin v. Compass Grp. USA*, 150 N.C. App. 480, 481, 482-84, 563 S.E.2d 633, 635, 636-37 (2002) (lifted a forty pound box of syrup out of truck); *Beam v. Floyd's Creek Baptist Church*, 99 N.C. App. 767, 769, 394 S.E.2d 191, 192 (1990) (carried a heavy spotlight backwards up a flight of stairs); *Kelly v. Carolina Components*, 86 N.C. App. 73, 76-77, 356 S.E.2d 367, 369 (1987) (carried a door on head while climbing down a ladder); *Bradley*, 77 N.C. App. at 451-52, 335 S.E.2d at 52-53 (lifted box off floor). Plaintiff having failed to produce competent evidence of a specific incident that caused his injury, we hold that the Court of Appeals erred when it affirmed the Commission's opinion and award.

For the foregoing reasons, we reverse the decision of the Court of Appeals affirming the Industrial Commission's opinion and award. This case is remanded to the Court of Appeals for further remand to the Industrial Commission for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Justice MARTIN did not participate in the consideration or decision of this case.