The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to any misjoinder or nonjoinder of parties.
3. Plaintiff is Hubert Chambers.
4. Defendant is, on the date of the alleged injury and at all times pertinent hereto, Transit Management of Charlotte, which is a corporate self-insured employer.
5. Defendant regularly employed three or more employees and is bound by the North Carolina Workers' Compensation Act.
6. An employer-employee relationship existed between defendant and plaintiff on December 4, 2000, the alleged date of injury.
 7. Plaintiff's last date of employment was December 4, 2000. *Page 3 
8. The correct average weekly wage for plaintiff is $700.47, which results in a compensation rate of $467.21.
9. The parties stipulated into evidence a packet labeledStipulated Exhibit 1 consisting of thirteen tabs that included plaintiff's medical records, Job Site Analysis, Employee Injury and Illness Report Form, Operator Performance Evaluation, Bus Route/Door Opening Data, Industrial Commission Forms, and a letter to Randy Mullinax dated June 19, 2002. 10. The issues before the Full Commission were:
 a. Whether plaintiff suffered a specific traumatic incident to his neck and back while working for defendant pursuant to N.C. Gen. Stat. § 97-2(6);
 b. Whether plaintiff suffers from an occupational disease to his neck, back, and left arm pursuant to N.C. Gen. Stat. § 97-53(13);
 c. Whether plaintiff suffered an injury by accident to his neck, back, and/or left arm pursuant to N.C. Gen. Stat. § 97-20;
 d. The amount of compensation due plaintiff subsequent to December 4, 2000, if any, pursuant to N.C. Gen. Stat. § 97-29; and
 e. Whether plaintiff is entitled to payment of medical care supplied for treatment of the injuries to plaintiff pursuant to N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon all of the evidence of record and reasonable inferences drawn therefrom, and in accordance with the directives of the Supreme Court of North Carolina, the Full Commission finds as follows:
 FINDINGS OF FACT *Page 4 
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 59 years old and was a high school graduate. Plaintiff's previous work history included working in a warehouse and in a clothing factory.
2. The essential facts in this case are not in dispute. Plaintiff was employed as a bus driver with defendant for 30 years from April 9, 1970, until December 4, 2000. While operating a bus, plaintiff used his hands approximately 90% to 100% of the time.
3. Plaintiff drove two types of buses, the Flexible or "Flex" bus and the Nova bus. Evidence of plaintiff's job duties was presented by plaintiff's testimony; the testimony of Robert L. Covington Jr., Superintendent of Safety and Training; a videotape depicting plaintiff on both buses as he demonstrated his job duties; and a job site analysis performed by Teresa Lee Hoey. In addition, defendant provided evidence based on a survey concerning the number of door openings on plaintiff's four routes, which was conducted in conjunction with Larry Kopf, defendant's Director of Scheduling. Defendant also made the crank handle and switch used by plaintiff available at the hearing before the Deputy Commissioner.
4. Mr. Covington, a bus driver/operator before becoming defendant's Superintendent of Safety and Training, testified that plaintiff's job is not a very physically demanding job, but agreed that driving those particular buses requires repetitive use of the left and right upper extremities and that more functions are required to be performed with the left arm and hand as opposed to the right. Randy Mullinax, Director of Safety and Administration for defendant, agreed that the job performed by plaintiff required repetitive and frequent use of the hands and arms. *Page 5 
5. According to the Job Site Analysis performed by defendant's expert, plaintiff's job requires "frequent to constant" use of the upper extremities and "occasional" tasks in the medium range of exertional activity, and includes ergonomic risk factors of "repetition, vibration from seat, and static sitting postures."
6. Plaintiff was able to perform his job duties until December 4, 2000. On that date, he was assigned a new bus route. Plaintiff described his new route as being more stressful than the route he had done prior to December 4, 2000, because it was a longer route with less time to rest at the end and there was more congestion. According to plaintiff, his former routes had been destroyed and no longer existed. According to Mr. Covington, there is really no difference between one route and another, because the physical requirements in driving the bus are approximately the same for each route. 7. Plaintiff testified that, on December 4, 2000, he began to develop left hand, neck, and shoulder problems during the new route. Plaintiff contacted a supervisor and stated that he was returning to the garage, as he could not continue work. At the hearing before the Deputy Commissioner, plaintiff was unable to pinpoint any specific event that occurred during the route on December 4, 2000, that lead to his neck and shoulder problems, and testified instead that the problems occurred gradually over the day and into the evening. Similarly, on an Employee Injury and Illness Report Form plaintiff filled out for defendant on December 18, 2000, plaintiff indicated that he was driving when he noticed left arm numbness but did not know exactly what caused the numbness. 8. After leaving work on December 4, 2000, plaintiff went home and his symptoms continued to increase. Plaintiff took Tylenol to relieve his pain and saw his primary care physician the following day. After several visits to his family physician, plaintiff was evaluated *Page 6 
by Dr. Thomas H. Buter, Dr. Daniel B. Murrey, and Dr. Alfred L. Rhyne at Charlotte Orthopedic Specialists. On March 5, 2001, Dr. Murrey referred plaintiff to Dr. Tim E. Adamson, a neurosurgeon with Carolina Neurosurgery Spine Center. From that date forward, Dr. Adamson has been plaintiff's primary treating physician. 9. Plaintiff came under the care of Dr. Adamson on April 2, 2001. Dr. Adamson was concerned that plaintiff had a disc herniation at C7-T1 and recommended a microendoscopic discectomy at C7-T1. He further noted that there was a degree of spondylotic disease throughout the cervical spine that would likely require intervention. Dr. Adamson ultimately performed two surgeries on plaintiff: (1) a microdiscectomy on the left at C7-T1 of plaintiff's cervical spine on April 26, 2001, and (2) a left ulnar nerve (cubital tunnel) release on September 28, 2001. Dr. Adamson described the relationship between these conditions as a "double crush syndrome":
 It's not uncommon to have what's referred to as a double crush syndrome in which there's irritation at two sites along the same nerve, it could be involving the neck and then also down, in this case, the ulnar nerve at the medial epicondyle, or just at the elbow.
 . . . It's somewhat poorly understood as to exactly why it occurs, but may be related just to the fact that you have irritation of the nerve at one site, and if you have a tendency or predilection to develop irritation at another site, just the increased sensitivity of the nerve from one site of pressure will sometimes make both sites symptomatic, and significantly so. It's not uncommon to have both of them require treatment to break the whole pattern.
10. Plaintiff underwent a functional capacity evaluation on March 5, 2002. Dr. Adamson reviewed the functional capacity evaluation and concurred with the results. On May 13, 2002, he rated plaintiff with a 30% permanent partial impairment of the left upper extremities, which Dr. Adamson later clarified to be the arm and not merely the hand. *Page 7 
Furthermore, according to Dr. Adamson, plaintiff is capable of sedentary to light work, but not of driving the bus due to the use of the left hand and public safety issues. 11. In a letter dated June 20, 2002, Dr. Adamson indicated that plaintiff's ulnar entrapment neuropathy was aggravated once it was "established" by plaintiff's repetitive use of the left hand. Furthermore, Dr. Adamson was not aware of any studies revealing foraminal stenosis or ulnar entrapment as direct occupational risks of the employment of bus driving, but opined that, due to the repetitive use of the left arm in the bus, plaintiff would be at risk for ulnar entrapment. Dr. Adamson further opined that plaintiff's employment as a bus driver would not place plaintiff at a greater risk of developing spondylotic disease of the cervical spine or plaintiff's subsequent foraminal stenosis; however, it is possible that plaintiff's job as a bus operator may have aggravated his foraminal stenosis. Dr. Adamson indicated that causation would be difficult to establish with regard to either plaintiff's ulnar entrapment or his foraminal stenosis or spondylosis, but that plaintiff's ulnar entrapment could reasonably be assumed to be caused or aggravated by repetitive use of the left arm.
12. Dr. Adamson further clarified his letter through his deposition testimony. While Dr. Adamson is of the opinion that plaintiff's employment aggravated his conditions or existing symptoms of ulnar nerve entrapment and spinal stenosis with regard to triggering symptoms, his opinion regarding increased risk is that plaintiff's employment placed him at greater risk for aggravating the conditions or their symptoms than the general public. Considering the totality of Dr. Adamson's testimony, Dr. Adamson is not of the opinion that plaintiff was placed at an increased risk of developing either condition as compared to the members of the general public not so employed. *Page 8 
13. Upon the request of defendant, plaintiff's medical records, the video-tape, and the job analysis were reviewed by Dr. Catherine M. Dover, an emergency physician at North Tryon Urgent Care, the primary facility for the treatment and evaluation of defendant's employees. Dr. Dover is familiar with the bus driver job requirements and has in fact driven the type buses that plaintiff drove. While Dr. Dover did not examine plaintiff, she is familiar with the job requirements and did perform a medical file review. Dr. Dover felt that, depending on the patient, repetitive use possibly causes a physical condition to become symptomatic and plaintiff could be at a greater risk of developing symptomatology. However, plaintiff's employment would not place him at a greater risk of contracting or developing ulnar nerve entrapment, spinal stenosis, or spondylosis. 14. While plaintiff's conditions or his symptoms may have been aggravated by his employment with defendant, the greater weight of the evidence of record fails to demonstrate that his employment with defendant placed him at an increased risk of developing either the ulnar or cervical conditions as compared to the general public not so employed. 15. Although plaintiff testified that his new route on December 4, 2000, was more stressful than his previous routes, he has failed to prove by the greater weight of the evidence that he sustained an injury as a result of the interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences. Furthermore, plaintiff was initially unsure whether his conditions were related to his employment or due to other factors, including yard work.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, and in accordance with the directives of the Supreme Court of North Carolina, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff has failed to prove that, on December 4, 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant, because plaintiff has failed to demonstrate that his injuries were due to "the interruption of the routine of work and the introduction thereby of unusual conditions likely to result in unexpected consequences." Ferreyra v. Cumberland County, 175 N.C.App. 581,584, 623 S.E.2d 825, 827 (2006) (internal quotation marks omitted); N.C. Gen. Stat. § 97-2(6). 2. Plaintiff has failed to prove that he sustained an injury by way of specific traumatic incident arising out of and in the course of his employment with defendant, because the gradual onset of pain described by plaintiff as occurring over the course of December 4, 2000, does not satisfy the requirement of a "specific traumatic incident" under the Act. N.C. Gen. Stat. § 97-2(6);Chambers v. Transit Management, 360 N.C. 609, 618, 636 S.E.2d 553, 558
(2006). 3. Plaintiff has failed to prove that he contracted an occupational disease within the meaning of the Act, as he has failed to prove the requisite element that his employment with defendant placed him at an increased risk of developing either the ulnar or cervical condition as compared to the general public not so employed. N.C. Gen. Stat. § 97-53(13); Chambers v. Transit Management, 360 N.C. 609, 612,636 S.E.2d 553, 554 (2006).
 * * * * * * * * * * * *Page 9 
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits must be, and is hereby, denied.
2. Each party shall bear their own costs.
This 23rd day of March 2007.
 S/____________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/____________________ CHRISTOPHER SCOTT COMMISSIONER
 S/____________________ DANNY L. MCDONALD COMMISSIONER