* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Upon its review, the Full Commission affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter;
2. All parties are subject to and bound by the North Carolina Workers' Compensation *Page 2 
Act;
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties;
4. The carrier on the risk for defendant-employer in this claim is Liberty Mutual Insurance Company;
5. Plaintiff alleges to have sustained a compensable injury to his back, neck and upper extremities in the form of an occupational disease, spinal stenosis, as a result of constant bumping up and down in a forklift and carpal tunnel syndrome as a result of loading and unloading metal parts from a forklift bucket on or about February 20, 2005;
6. Defendants have denied this case and contend plaintiff failed to report the claim in a timely manner and that there was no indication of an injury by accident, and further that plaintiff did not sustain an occupational disease while employed with defendant-employer;
7. An employment relationship existed between the employee and employer on February 20, 2005; and
8. The parties stipulate to an average weekly wage of $606.57 and a compensation rate of $404.40 based on the Form 22.
 * * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was sixty-two years old and had a ninth grade education. Plaintiff began working for defendant-employer on December 16, 1996. Citation Foundry is a foundry where metal parts are cast. At the time *Page 3 
plaintiff worked there, the production process required movement of raw material and finished products around the plant using forklifts. During his employment, plaintiff worked in several different positions, including as core maker, grinder, drill press operator and finish grinder and on occasion as a forklift operator. In October 2001, plaintiff began working as a full time forklift operator and continued working in that capacity until February 2005, except for a four-month period of time in 2004 when his job was scale operator.
2. The plant layout consisted of two long buildings that faced each other with an outdoor area between the buildings. Plaintiff called this middle outdoor area "the courtway." The buildings on either side of the courtway have large double doors for each of the different departments, and the forklift drivers take the loaded and empty tubs and boxes from one area or department to another through these doors, into the courtway between the buildings and then to other departments. The courtway is made of cracked and broken cement that has potholes. The grounds surrounding the plant are grass and dirt.
3. Plaintiff worked eight to sixteen-hour shifts for defendant-employer. Most of the time, he worked sixteen-hour shifts and, at various times, worked in the core room, in gate breaking, in grinding and in shipping. Plaintiff's job did not require him to drive the forklift when he was working in the core room, the grinding room or operating the drill press. He performed these jobs for three or four weeks apiece when he first started with defendant-employer; then he worked in the paint room and as a drill press operator.
4. The employment records that defendant-employer produced at hearing corroborated plaintiff's testimony that he took the lift truck operator review on May 20, 1998, about seven years before he was released from work on medical leave.
5. At the hearing before the Deputy Commissioner, plaintiff testified that as a *Page 4 
forklift driver, you "just steady go," taking tubs of the metal pellets and dumping them in the wheelabrater, taking the empty tubs back out and putting them aside, picking up another filled tub for the wheelabrater and so on and so forth. This required plaintiff to drive the forklift in the plant and in the courtway. Plaintiff's job also involved driving the forklift on the grounds around the outside of the plant.
6. A video, received into evidence, shows bins of completed parts and raw material along the outside walls of the buildings in the courtway. The video shows multiple forklifts moving from building to building and up and down the outside area.
7. Plaintiff estimated that he drove the forklift outside the plant just as much as he drove it inside. Plaintiff also loaded and unloaded trucks outside using the forklift. The road coming through the courtway and back to the shipping department was unpaved and bumpy with ditches and holes. When plaintiff drove the forklifts, he bounced somewhat, but especially while he was on the courtway as the ground there was not smooth. Plaintiff estimated that he would go up and down the courtway fifty to sixty times a day.
8. Plaintiff testified that when he started driving the forklifts, none of the three forklifts used by the shipping department had a suspension system and they had hard rubber tires, so the only cushioning the driver had was the padding in the seat. At an unknown time, the company bought one or more Baker forklifts, which did have springs. When driving the older models outside, plaintiff would be bounced around and rocked from side to side to some extent as he drove over the uneven surfaces. However, the Full Commission does not accept as credible his testimony that he was being constantly bounced and jarred.
9. In November 2004, plaintiff began to notice that his left foot was dragging. He was also having episodes where it felt as if needles were pricking his arms. On December 14, *Page 5 
2004, he went to Mt. Gilead Medical Services for the symptoms. At that appointment, he denied having any back, hip or leg pain associated with the other symptoms. The physician's assistant who examined him that day referred him to Dr. Tellez for a neurological evaluation.
10. Dr. Tellez examined plaintiff on January 5, 2005. Plaintiff again denied having back or neck pain. There were abnormalities on examination but they were not specific to a particular diagnosis, so Dr. Tellez ordered diagnostic tests. The cervical spine MRI that was subsequently performed revealed spinal stenosis from spondylosis at C4-5, which appeared to be the cause of plaintiff's symptoms, although he also had evidence of chronic ischemic small vessel disease in his brain, but no major stroke was evident.
11. On January 20, 2005, Dr. Tellez reviewed the test findings with plaintiff. He then referred plaintiff to Dr. Hey for a surgical consultation regarding the cervical spondylosis with probable myelopathy. In addition, since nerve testing had proved consistent with carpal tunnel syndrome, he prescribed wrist splints.
12. Plaintiff's condition continued to deteriorate and, as he testified, he would fall when he tried to get onto the forklift because he did not have enough bounce to get up onto it. Plaintiff began having trouble walking and he began to have pain in the bottom of his back, greater on the left side than the right.
13. Plaintiff did not sustain any known injury at work; however, he has claimed that his cervical spondylosis was due to his bouncing on the forklift at work.
14. Dr. Hey evaluated plaintiff and recommended surgery to decompress and fuse the affected area of the cervical spine. Surgery was scheduled on more than one occasion but it had to be cancelled because plaintiff developed pneumonia and later because his blood pressure was not adequately controlled. He had not been able to undergo the operation as of the date of the *Page 6 
Deputy Commissioner's hearing but was to have surgery as soon as his hypertension had stabilized.
15. Dr. Tellez advised plaintiff to avoid driving the forklift due to the risk of injury to his spinal cord and possible paralysis. Plaintiff relayed this information to defendant-employer. On February 18, 2005, plaintiff left his employment with defendant-employer as he was unable to continue to work.
16. Dr. Tellez opined that, looking at the general population of males at age fifty, more than sixty or seventy percent will already have degeneration of the spine. He explained that this was why it is so hard to know whether plaintiff's job triggered or accelerated his spinal stenosis.
17. Although Dr. Tellez opined that plaintiff was placed at an increased risk of aggravating and potentially developing spinal stenosis due to his job duties as a forklift driver, he was unable to state to a reasonable degree of medical certainty whether driving the forklift caused the stenosis.
18. The Full Commission finds Dr. Telez's testimony to be inconsistent and, at times, ambiguous, on direct and cross-examination. Furthermore, Dr. Telez's opinions were based on a hypothetical assuming constant jarring and constant looking backwards, which the Full Commission finds to be an exaggeration of plaintiff's working conditions. Accordingly, the Full Commission finds that although plaintiff may have had pre-existing, non-disabling degenerative changes in his cervical spine when he began the forklift operator position with defendant-employer and his performance of the forklift operator job may have been a contributing factor to the acceleration of his condition; it was not the cause of his degenerative condition.
19. The Full Commission finds the greater weight of the medical evidence of record, *Page 7 
including Dr. Tellez's testimony, when considered in its entirety on direct and cross-examination, to be insufficient to establish the necessary causal relationship for plaintiff's condition to be compensable as an occupational disease and specifically to prove plaintiff's employment exposed him to a greater risk of contracting spinal stenosis relative to the general public. Therefore, the Full Commission finds that plaintiff has failed to establish an occupational disease where his employment exposed him to a greater risk of contracting the disease of spinal stenosis than the general public not so employed.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and stipulations, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. For an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), it must be (1) characteristic of persons engaged in the particular trade or occupation in which the [plaintiff] is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be "a causal connection between the disease and the [plaintiff's] employment." Rutledge v. Tultex Corp./Kings Yarn,308 N.C. 85, 93; 301 S.E.2d 359, 365 (1983) [quoting Hansel v. ShermanTextiles, 304 N.C. 44, 52, 283 S.E.2d 101, 105-06 (1981) citingBooker v. Duke Med. Ctr., 297 N.C. 458,468,475; 256 S.E.2d 189,196,200 (1979)].
2. In addition, the claimant must show that the employment significantly contributed to, or was a significant causal factor in, the disease's development. Hardin v. Motor Panels, Inc., 136 N.C. App. 351,524 S.E.2d 368 (2000) [citing Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983)]. Further, a plaintiff seeking to prove that he has a compensable occupational *Page 8 
disease must show that the employment exposed him to an increased risk of contracting, not merely aggravating, the condition. Chambers v.Transit Mgmt., 360 N.C. 609, 636 S.E.2d 553 (2006).
3. In this case, the greater weight of the medical evidence of record, including Dr. Tellez's testimony, when considered in its entirety on direct and cross-examination, is insufficient to establish the necessary causal relationship for plaintiff's condition to be compensable as an occupational disease and specifically to prove plaintiff's employment exposed him to a greater risk of contracting spinal stenosis relative to the general public. N.C. Gen. Stat. § 97-53(13); Booker v. MedicalCenter, supra.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers' compensation benefits must be and is hereby denied.
2. Each side shall pay its own costs.
This the ___ day of April 2008.
S/___________________ PAMELA T. YOUNG CHAIR
 CONCURRING: *Page 9 
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DANNY L. McDONALD COMMISSIONER *Page 1