***********
Upon review of the competent evidence of record, with reference to the errors assigned and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, reverses the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as: *Page 2 
 STIPULATIONS
1. The plaintiff, Kimberly G. Daniel, was employed by defendant Laboratory Corporation of America from June 14, 1999 until July 12, 2006.
2. The parties are subject to the North Carolina Workers' Compensation Act, and at all relevant times, defendant regularly employed three or more employees. An employer-employee relationship existed between plaintiff and defendant at all relevant times.
3. At all relevant times defendant was a duly qualified self-insurer, as that term is defined in the Act regarding workers' compensation coverage, which was administered by a third party administrator, Broadspire.
 *********** EXHIBITS
The following exhibits were admitted into evidence:
 (a) Stipulated Exhibit 1: Pre-Trial Agreement
 (b) Stipulated Exhibit 2: Plaintiff's Medical Records
 (c) Stipulated Exhibit 3: Plaintiff's Supplemental Medical Records
 (d) Plaintiff's Exhibit 1: Ergonomic Report
 (e) Defendants' Exhibit 1: Plaintiff's Interrogatory Responses for 582705 (Neck Claim)
 (f) Defendant's Exhibit 2: Plaintiff's Recorded Statement
 (g) Defendant's Exhibit 3: Duke Medical Center Note dated February 7, 2005
 (h) Defendant's Exhibit 4: Duke Medical Center Note dated March 14, 2005
 (i) Defendant's Exhibit 5: Plaintiff's Interrogatory Responses for 582704 (Foot Claim) *Page 3 
 (j) Defendant's Exhibit 6: Restriction Note dated August 4, 2005
 (k) Defendant's Exhibit 7: EEOC Complaint
 (l) Defendant's Exhibit 8: Notes Regarding Plaintiff's Work Performance in First Quarter of 2005
 (m) Defendant's Exhibit 9: Plaintiff's Performance Review from March 2006
 (n) Defendant's Exhibit 10: Log of Plaintiff's Job Performance Errors
 (o) Defendant's Exhibit 11: Performance Improvement Plan for Plaintiff dated May 5, 2006
 (p) Defendant's Exhibit 12: Termination Notice
 (q) Defendant's Exhibit 13: PLB Request Form
 (r) Defendant's Exhibit 14: Time and Attendance Records
 (s) Defendant's Exhibit 15: Timeline
 (t) Defendant's Exhibit 16: Resume of Vicki Missar, Ergonomic Consultant
 (u) Defendant's Exhibit 17: Report of Vicki Missar, Ergonomic Consultant
 *********** ISSUES
The remaining issues to be decided are:
 (a) Whether plaintiff's foot condition is a compensable occupational disease?
 (b) If so, to what benefits, if any, is plaintiff entitled?
 ***********
Based upon the competent and credible evidence of record, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Plaintiff was born October 18, 1962 and is 46 years old. She is five feet, two and a half inches, and at the time of the hearing before the Deputy Commissioner her weight had fluctuated from approximately 190 to 220 pounds. Plaintiff was first hired by defendant LabCorp in or about April 1997, and worked in the extractions department of the laboratory for approximately one year. In the extractions department, plaintiff was responsible for working with urine samples to extract and test for the presence of certain illegal substances. Plaintiff left defendant-employer and worked as a teacher.
2. In or about June 1999, plaintiff returned to work for defendant-employer in the extractions department, working third shift from 11:45 p.m. until 8:15 a.m. Plaintiff worked in this position until approximately March 2003. Plaintiff testified that when she worked in the extractions department she was able to sit for longer periods of time.
3. On or about March 2003, plaintiff transferred to the position of Gas Chromatograph Mass Spectrometry ("GCMS") operator. As a GCMS operator, plaintiff was responsible for operating approximately eleven chemical analyzer machines in the laboratory. The lab studies are performed for and used by courts around the country for testing various drug and/or alcohol levels. Each sample must be verified, re-verified, and tracked by chain of custody documentation. In the GCMS operator position, plaintiff would begin processing a batch of samples by walking over to the "work in progress" rack and picking-up a folder and a plastic quadrant that contained approximately 24 vials. Plaintiff would then walk to one of her machines, tune it, and load and run a test sample. She typed the sample order and the 9-digit number from each of the 24 samples into the computer, saved the file, and printed a report. Next, plaintiff completed a log sheet, verified the data, and signed the chain of custody document. *Page 5 
She then loaded the quadrant of vials into the machine for testing and pressed the start/run button. After the machine completed its automated testing processes, plaintiff was required to review the data to determine if the criteria were met. After the samples were re-verified, plaintiff would stamp paperwork confirming chain of custody and print a summary report from the computer. She then loaded the quadrant of vials into the machine for testing and pressed the start/run button. Machine run time is a significant portion of the testing process. Depending on the substance for which plaintiff was testing, the machine run time varied from approximately 85 minutes to 224 minutes for a 24-sample batch and up to 600 minutes for a 40-sample batch.
4. After the machine completed its automated testing processes, plaintiff was required to review the data, applying the standard operating procedures to determine if the criteria passed. She then removed the quadrant from the machine, and another employee would re-verify or confirm that all of the 9-digit numbers on the vials matched the data entered by plaintiff. After the samples were re-verified, plaintiff would stamp paperwork, confirming chain of custody and then print a summary report from the computer.
5. Plaintiff was expected to run between 6 to 10 batches total for the 8-hour shift. During her eight-hour shift, plaintiff received two 10-15 minute breaks and one 30-minute break. During her actual work time, lab chairs were available throughout the lab and were used by the employees, including plaintiff. There were chairs on each row as well as a table and chairs that are specifically for employees to review their data and also four desks with chairs at the front of the lab. Employees used the lab chairs when typing in the 9-digit numbers for each vial, reviewing and interpreting data, and re-verification of another employee's work as well as other times throughout the day. According to plaintiff, she regularly had to verify (re-verify) approximately 10 batches of samples per shift for an employee named Megan, and it took her 10 minutes to verify each batch. *Page 6 
Before her first break at 3:00 a.m., plaintiff would have 3-4 batches to verify for Megan. To perform the re-verifications, plaintiff sat in one of the lab chairs. For re-verifications alone, plaintiff would be sitting at least 30-40 minutes prior to her first break, and a total of at least 100 minutes throughout her shift in order to perform the re-verifications of Megan's work which constituted only a part of the work duties that allowed her to sit. Everyone in the lab was responsible for re-verifying and employees were not allowed to re-verify batches that they personally loaded.
6. Plaintiff testified that she experienced "excruciating" pain after her first eight-hour shift in the GCMS position in March 2003, that she sought medical treatment a couple days later and that the doctor provided her with orthopedic inserts for her shoes. Plaintiff further testified that in April 2004, after approximately 1 year in the GCMS position, she woke up and her ankle pain made it difficult to walk from her bed to the bathroom and that this condition would recur after standing on her feet for long periods of time. Plaintiff denies that she suffered an injury by accident at work.
7. According to plaintiff's testimony, she was out of work due to problems with her feet for one week, July 1, 2005 until July 8, 2005.
8. On August 4, 2004, plaintiff had her annual physical, during which she reported pain in her ankles and difficulty walking in the morning. Plaintiff reported that her ankle pain improved with activity and "it takes approximately thirty minutes of exercise in the morning prior to the pain subsiding." Non-weight-bearing radiographs were taken of both of plaintiff's hands and feet, which indicated "joint space loss, osteophytosis, and subchondral sclerosis within the first metatarsophalangeal joints bilaterally consistent with osteoarthritis."
9. Dr. Mark Easley, an orthopaedic surgeon at Duke University Medical Center, specializing in foot, ankle and knee conditions, saw plaintiff on September 14, 2004. Plaintiff *Page 7 
reported right, greater than left, ankle pain over the prior two years. Plaintiff further reported that the onset of pain began with her working in a standing position for longer periods of time and also coincided with a right ankle sprain. Plaintiff's physical exam revealed that she had significant bilateral pes planus (flat feet), which did not improve with toe raise and was worse on the right than the left. Plaintiff was also found to have bilateral hallux rigidus with associated dorsal osteophytes, which is "early arthritis of the big toe joint." In his assessment, Dr. Easley noted that plaintiff had "bilateral right greater than left poorly compensated pes planus with probable associated posterior tibial tendon dysfunction/damage." Plaintiff declined to undergo "weight-bearing" radiographs due to her expressed fear of radiation exposure, even after Dr. Easley explained that failure to obtain the radiographs would affect his "ability to fully diagnose and treat her." Dr. Easley also recommended bracing, which plaintiff did not pursue.
10. On March 28, 2005, plaintiff underwent an MRI of both ankles, which indicated (1) a high grade partial tear of the right posterior tibialis tendon with tendinosis of left posterior tibialis tendon, (2) torn bilateral spring ligaments, (3) bilateral soft tissue edema, and (4) sinus tarsi syndrome bilaterally. Although plaintiff had previously denied any trauma to her left ankle, the MRI raised a "question [as to] prior injury to the anterior talofibular ligament" in the left ankle.
11. On April 12, 2005, plaintiff returned to Dr. Easley, who noted that her physical examination was virtually unchanged since her visit approximately 5 months earlier. Dr. Easley reviewed the MRI findings with plaintiff and noted that she was not interested in surgical intervention. On August 3, 2005, plaintiff returned to Dr. Easley and his physician's assistant, Ashley Grimsley, PA-C. Ms. Grimsley recommended that plaintiff take 10-minute breaks every hour and that plaintiff should not do any climbing or squatting. Plaintiff's job allowed her to work within these restrictions without the need for job modifications. Dr. Easley was of the opinion that *Page 8 
the foot problems shown on the MRI and identified through his examination confirmed that plaintiff had a tibial tendon tear on the right, tendonosis on the left and bilateral spring tears. In his opinion these foot problems would have most likely come from repetitive stress rather than acute trauma. Dr. Easley was of the impression that plaintiff did heavy, intensive type work where she was on her feet most of the day for several years. Plaintiff described her work to him as requiring that she be on her feet constantly for seven hours a day, without a break. Dr. Easley testified that a person with posterior tibial tendon insufficiency can walk short distances without any pain. They can get up from a period of rest and do fine, but if the foot is pushed or fatigued beyond a certain threshold that is where the problems arise.
12. Dr. Easley's medical note from 14 September 2004 indicates a "probable associat[ion]" between Plaintiff's pes planus (flat feet) and her posterior tibial tendon dysfunction/damage. Dr. Easley opined that because plaintiff has flat feet, she was at an increased risk that a standing/walking job would stress the posterior tibial tendon, which could "lead to" posterior tibial tendon dysfunction. Dr. Easley further opined that the conditions shown on the MRI were caused at least in part by plaintiff's employment at Lab Corp, which required prolonged walking and standing, but plaintiff would have the same problems if she worked in any job requiring her to stand/walk all day. He also opined that plaintiff probably never would not have developed the foot pathology at issue if she had a sedentary job.
13. Plaintiff saw Dr. Daniel Ostrovsky who is board certified in internal medicine and pediatrics on July 26, 2005 complaining of intermittent neck pain and ankle pain. Based on plaintiff's report to him and a review of her medical charts, Dr. Ostrovsky noted that it was likely that the ergonomics of plaintiff's workplace was contributing and not beneficial towards her ankle and neck pain. However, during his deposition, Dr. Ostrovsky was shown an ergonomic survey of *Page 9 
plaintiff's position done on September 24, 2006 by Vicki Missar, a certified ergonomic evaluation specialist. He agreed that the primary risk factors for causing neck and ankle problems are repetition, vibration, force and extreme posture. Ms. Missar did not identify any risk factors in plaintiff's job that would survey because plaintiff was not the person performing the job during the survey and he felt that workplace environments affect workers differently according to height and other factors. Plaintiff had already been terminated at the time the survey was done. Ultimately Dr. Ostrovsky deferred to the ergonomist on whether the workplace environment presented a risk for causing ankle and neck problems.
14. At plaintiff's appointment with Dr. Ostrovsky on December 6, 2005 she reported that her ankle and neck pain were minimal, but continued to be a problem. Plaintiff was offered a referral to a pain clinic, which she declined.
15. On July 12, 2006, plaintiff was terminated from her job with defendant-employer due to unacceptable job performance, specifically related to work quality issues. Accuracy was an important component plaintiff's work. During the second quarter of 2006, errors were found in 38% of plaintiff's batches where she performed the initial review. Plaintiff had had problems with the quality of her work for which she had been counseled going back to at least January 2004.
16. On September 20, 2006, plaintiff returned to Dr. Ostrovsky. She reported that she had been laid off from work and that during the initial four weeks after being laid off, she had an exacerbation of her feet and neck symptoms. However, on the day of her visit, she presented without foot discomfort and had minimal residual swelling bilaterally. She was noted not to have needed any of her "prescribed as needed" muscle relaxant medications. Plaintiff testified that her feet were swollen for about six weeks after termination, but they got dramatically better thereafter. *Page 10 
17. Plaintiff has not seen any doctor for her feet or neck since September 20, 2006. At the hearing before the Deputy Commissioner, plaintiff testified that she is largely symptom-free now, and that her symptoms have essentially resolved. By February 5, 2007, less than a month following her termination, plaintiff returned to the teaching field, working part-time, 20 hours per week and earning approximately $1200.00 per month. Plaintiff agreed that no physician told her she was unable to work due to either her neck and/or feet problems, other than the one week in July 2005. No physician has assigned plaintiff any type of permanent impairment rating for her feet or neck.
18. Although Dr. Ostrovsky was of the opinion that plaintiff's job could have been a contributor to her ankle pain (he could not comment on the neck) based on plaintiff's subjective complaints; he further opined, however, that he could not say that her ankle condition was caused by her position with defendant-employer and that he would be less inclined to feel the job was an exacerbating factor if plaintiff could sit ten minutes every hour. In particular, he could not say whether plaintiff's job caused her posterior tibialis tendonitis, and he deferred to an orthopaedist on this question. He felt that plaintiff's job did not expose her to an increased risk of contracting her ankle conditions over the general public. With respect to the neck, Dr. Ostrovsky was of the opinion that plaintiff's work probably did not cause her neck problem or place her at an increased risk over the general public of developing her neck problem.
19. During his deposition testimony, Dr. Daniel Caffrey, a board certified orthopaedic surgeon with 18 years of experience, discussed respected medical peer-reviewed literature addressing the research on the cause of posterior tibial tendon dysfunction (PTTD). According to Dr. Caffrey, none of the articles (or the studies referenced therein) found any epidemiological link between posterior tibial tendon dysfunction and employment, even with respect to jobs that *Page 11 
require standing for prolonged periods of time. The studies indicate that such foot conditions typically occur in middle-aged to elderly women who are sedentary (not on their feet all day) and the condition is not associated with any particular occupation. The studies further indicate an association between posterior tibial tendon dysfunction and obesity, hypertension and diabetes. He testified that the medical community does not have a generally accepted opinion as to what causes posterior tibial tendon dysfunction. He further testified that having flat feet put the tendon at a biomechanical disadvantage to function normally so the literature implies that this could potentially be a factor but not based on any increased level of activity.
20. Based on the greater weight of the evidence, the Full Commission finds that plaintiff has not proven that the stress on her feet from the standing and walking required by her job with defendant-employer placed her at an increased risk over the general public for developing posterior tibial tendon dysfunction. The standing and walking plaintiff was required to do in her job was indistinguishable from the standing and walking required at many jobs in the labor market. Plaintiff had the option to stand or sit throughout the day and, contrary to the understanding of Dr. Easley, plaintiff's job did not involve heavy work or standing constantly all day for seven hours or more.
21. The Full Commission gives greater weight to the opinions of Dr. Cafferty and Dr. Ostrovsky who both opined that plaintiff's job did not place her at an increased risk for contracting posterior tibial tendon dysfunction over the general public. Plaintiff's job with defendant-employer did not cause or significantly contribute to the development of her posterior tibial tendon dysfunction and other conditions identified by the MRI. The Full Commission also gives greater weight to the opinions of Dr. Cafferty on this issue. Dr. Easley's assumptions about plaintiff's job duties and the amount of standing required are not supported by the *Page 12 
ergonomic survey or the greater weight of the lay testimony presented. Any prolonged standing or walking that plaintiff did on any job or away from work would have caused an exacerbation of her pain. Also, plaintiff had pre-existing flat feet, which likely contributed to her foot/ankle problems.
22. Plaintiff is not making a claim for temporary total disability compensation at the present time as she has missed only a week from work due to problems with her feet. Plaintiff is also not pursuing her claim that her neck condition is a compensable occupational disease.
 ***********
Based on the foregoing stipulations and findings of fact the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. For an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), it must be (1) characteristic of persons engaged in the particular trade or occupation in which plaintiff is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the plaintiff's employment. Rutledge v. Tultex Corp./Kings Yarn,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). In cases where the employment exposed the employee to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Id. While the employee may satisfy the causation prong by proving his employment aggravated his condition, he must further satisfy the remaining two prongs of the Rutledge test by establishing that his employment placed him at a greater risk of contracting the condition relative to the general public. Chambers v. Transit Mgmt., 360 N.C. 609, 611,636 S.E.2d 553,555 (2006), reh'g denied, 361 N.C. 227, 641 S.E.2d 801 (2007). *Page 13 
2. The competent evidence of record establishes that plaintiff's employment did not cause her posterior tibial tendon dysfunction or any of the other foot/ankle conditions that she may have, nor did her employment place her at an increased risk of developing these conditions over that of the general public. The testimony of Dr. Caffrey, which is based on generally accepted medical literature and to which the Full Commission has given greater weight, establishes that plaintiff's job at LabCorp did not cause her foot/ankle conditions. Dr. Easley based his causation opinion on his assumption that plaintiff did heavy, repetitive work that required her to stand for seven hours a day, which is not supported by the evidence. With respect to whether plaintiff's job placed her at an increased risk of contracting posterior tibial tendon dysfunction or any of the other foot/ankle conditions that she may have compared to the general public, the testimony of Dr Cafferty and Dr. Ostrovsky, to which the Full Commission has given greater weight, establishes that plaintiff's job with defendant-employer did not place her at an increased risk for contracting these foot/ankle conditions. Thus, plaintiff has not met her burden of establishing that she contracted a compensable occupational disease under N.C. Gen. Stat. § 97-53(13) (2007); Rutledge v. Tultex Corp./Kings Yarn, 308 N.C. 85,93, 301 S.E.2d 359, 365 (1983).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for compensation due to an occupational disease is DENIED.
2. Each side shall pay its own costs.
This the __ day of December 2008. *Page 14 
 S/_______________________
 BERNADINE S. BALLANCE
 COMMISSIONER
CONCURRING:
S/_______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/_______________________ DANNY L. McDONALD COMMISSIONER *Page 1