* * * * * * * * * * *
The Full Commission has reviewed the entire record consisting of the additional evidence in Dr. Furr's deposition, the briefs and oral arguments presented before the Full Commission on January 17, 2008, as well as the prior evidentiary record and Full Commission Opinion and Award of August 16, 2001. Based upon all of the evidence of record, and in accordance with the directives of the Court of Appeals, the Full Commission enters the following Opinion and Award.
 * * * * * * * * * * * *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in the pre-trial agreement as:
 STIPULATIONS
1. At the time of the alleged contraction of the occupational disease, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. At the time of the alleged contraction of the occupational disease, an employer-employee relationship existed between plaintiff and defendant-employer.
3. At the time of the alleged contraction of the occupational disease, defendant-employer was a qualified self-insurer, with Gallagher Bassett acting as its third-party administrator.
4. The employee's average weekly wage was $398.40, which yields a compensation rate of $265.60.
5. The issues before the Commission are whether plaintiff contracted a compensable occupational disease and, if so, to what benefits he entitled to receive.
 * * * * * * * * * * *
In accordance with the directives of the North Carolina Court of Appeals and based upon all the competent evidence of record, the Full Commission finds as facts the following: *Page 3 
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 41 years old, had a GED, was trained as a firefighter, and had work experience as a custodian, landscaper and in the manufacturing business.
2. In September 1991, plaintiff became employed as a part-time firefighter with defendant-employer, the City of Lexington. During this same time, plaintiff was also employed as a full-time custodian for Lexington City Schools, which is not affiliated or associated with defendant-employer.
3. In August 1994, plaintiff filed a workers' compensation claim against Lexington City Schools contending that he developed carpal tunnel syndrome as a result of his job duties as a custodian. Plaintiff's claim was accepted as compensable by Lexington City Schools, and plaintiff was paid certain workers' compensation benefits. Although plaintiff was also employed as a firefighter for defendant-employer in 1994, he only filed a claim against the City of Lexington arising out of his job as a custodian.
4. As a result of the 1994 workers' compensation claim against Lexington City Schools, plaintiff received conservative medical treatment from Dr. Gregory Mieden, a neurologist, for bilateral carpal tunnel syndrome and fibromyalgia/myofascial pain syndrome. Plaintiff was also treated conservatively by Dr. Scott Kniseley, another neurologist, who indicated that plaintiff's symptoms could continue for a period of time.
5. Plaintiff continued working full-time as a custodian and part-time as a firefighter. In 1995, he was involved in a motor vehicle accident in which his vehicle was destroyed after being struck by another car. Plaintiff again received treatment for pain and symptoms in his arms and hands following the automobile accident. *Page 4 
6. In July 1995, plaintiff began working as a full-time firefighter for the City of Lexington. The work schedule for a firefighter is 24 hours on-duty followed by 48 hours off-duty. During the 24-hour work period, a firefighter is engaged in a variety of scheduled activities and responds to emergencies as they occur.
7. The position of a firefighter includes planned activities scheduled from 7:00 a.m. to 5:00 p.m. Monday through Friday. These activities include a morning meeting, a brief period of optional individual exercise, classroom and practical training, inspections of local businesses and public service educational programs and presentations at day care centers, nursing homes and schools. Firefighters also receive a one-hour lunch break during this time. Scheduled activities are followed by dinner and a brief period of cleaning and completion of reports. The remaining 12 to 13 hours of the workday is free time and no activities are scheduled during this period. Although physical fitness is encouraged, exercise or weight lifting is not required by defendant-employer. Further, there is no evidence in the record of how frequently or for how long plaintiff engaged in weight lifting, how much weight he lifted, or whether he engaged in weight lifting during times he was not working.
8. In addition to the daily scheduled activities, one time per month, firefighters participate in a "hot drill," which is a practice session of a particular skill such as utilizing a ladder or hose. These drills last from five minutes to one hour.
9. When a firefighter's workday is scheduled for either a Saturday or Sunday, planned activities are limited. On Saturdays, firefighters engage in some light cleaning for a few hours with the remainder of the day being down time. There are no scheduled activities on Sunday. *Page 5 
10. Firefighters also respond to 150 to 200 emergency calls per year. The vast majority of these calls do not involve fires and during two-thirds of the calls firefighters take minimal or no action. Out of the emergency calls, only two to three per month involve fires and of these, only one per month involves a structural fire.
11. During the structural fires, firefighters utilize the hose to put out the fire for approximately five to 20 minutes. Thereafter, firefighters utilize a variety of tools including a pipe pole to knock down ceilings, shovels, brooms, ladders and saws. Many of these tools, such as a chainsaw and a K-12 saw, are seldom used and the tools are generally not used for any more than a 20-minute period. On average, the firefighting operation lasts no more than two hours.
12. The position of a firefighter involves varied activities and no strenuous use of the hands or arms on a daily basis. Although firefighters use certain tools in training and in fighting fire, these tools are not used on a constant or regular basis. Further, while the activity of fighting a fire may be strenuous, it does not involve repetitive use of the hands in the same position for a sustained period of time. In addition, the strenuous activity of fighting a fire in general occurs on an infrequent basis and for a brief period of time when compared to all other job activities of a firefighter. According to Fire Chief William Deal, firefighters are seldom required to push, pull or grasp for over 15 minutes at a time in any given month.
13. Although more than 100 individuals have worked as a firefighter for defendant-employer over the past two decades, none except plaintiff have ever complained of hand or arm pain due to work. *Page 6 
14. In addition to his job as a firefighter, for six months each year in 1996 and 1997, plaintiff also worked as a landscape maintenance assistant. His primary job duty involved use of lawnmowers.
15. In the summer of 1997, plaintiff began experiencing recurrent pain and numbness in his hands and arms. Initially, plaintiff did not relate this condition to his job as a firefighter.
16. In December 1997, plaintiff received treatment from Dr. Jonathan Hinson who diagnosed recurrent numbness in the hand and arm and referred plaintiff to Dr. Chester C. Hayworth, a neurologist.
17. Dr. Hayworth began treating plaintiff in January 1998, and diagnosed recurrent carpal tunnel syndrome which he treated conservatively for a brief period of time. Nerve conduction studies confirmed the diagnosis of carpal tunnel syndrome, and Dr. Hayworth referred plaintiff to Dr. Bryan Noah, an orthopaedic surgeon. Dr. Noah treated plaintiff throughout 1998 with injections and medication.
18. Dr. Noah was of the opinion that the activities performed by a firefighter would not be a likely cause of carpal tunnel syndrome. Dr. Noah has not seen any association in his own practice or in medical literature between carpal tunnel syndrome and the activities of a firefighter. Based upon the job duties of a firefighter, as described by the witnesses at the Deputy Commissioner's hearing, Dr. Noah was of the opinion that there was little likelihood plaintiff's job caused carpal tunnel syndrome.
19. Following conservative care with Dr. Noah, plaintiff chose to receive treatment from Dr. Gary G. Poehling beginning in February 1999. Dr. Poehling is a board-certified orthopaedic surgeon with an added qualification in hand surgery and was the Chairman of Orthopaedic Surgery at Wake Forest University Medical Center. Dr. Poehling diagnosed bilateral carpal tunnel syndrome and chronic *Page 7 
regional pain syndrome and recommended bilateral carpal tunnel releases. Plaintiff underwent a left carpal tunnel release on May 4, 1999 and a right carpal tunnel release on August 4, 1999.
20. Plaintiff went out of work as of the date of the left carpal tunnel release on May 4, 1999. Following post-operative treatment, Dr. Poehling released plaintiff to return to work as of August 30, 1999 with certain restrictions. Dr. Poehling thereafter ordered a functional capacity evaluation, which showed symptom magnification and poor effort on the part of the plaintiff. As a result, plaintiff was categorized as being able to work only in the light duty category, and Dr. Poehling released him as of November 1, 1999 with lifting restrictions and restrictions on repetitive motion. As of the date of the hearing before the Deputy Commissioner, plaintiff had not made any attempts to return to employment.
21. Dr. Poehling rated plaintiff with a 15% permanent partial disability to the right hand and a 15% permanent partial disability to the left hand.
22. Based upon his treatment of plaintiff and a review of the job duties of a firefighter, Dr. Poehling was of the opinion that the firefighter job does not increase an individual's risk of developing either chronic pain syndrome or carpal tunnel syndrome.
Dr. Poehling also noted that he was unaware of any literature indicating an increased incidence of carpal tunnel syndrome in firefighters. Dr. Poehling was further of the opinion that plaintiff would have contracted carpal tunnel syndrome whether he was a firefighter or in another occupation.
23. Dr. L. Andrew Koman, an expert consultant retained by defendant, has been an orthopaedic surgeon for 20 years and his medical studies focused on hand and microsurgery. He has been a professor at Wake Forest University and Duke University and has treated hundreds of individuals with carpal tunnel syndrome. Prior to rendering opinions, Dr. Koman reviewed medical *Page 8 
records as well as job descriptions of a firefighter. Dr. Koman was of the opinion that the firefighter job does not increase the risk of developing carpal tunnel syndrome and does not present a hazard for contracting the disease. Dr. Koman also was of the opinion that plaintiff's job as a firefighter did not cause his carpal tunnel syndrome.
24. Dr. Stephen Furr evaluated plaintiff on March 7, 2000. Dr. Furr is a general orthopedist who has no specialty in hand surgery. Several diagnostic tests taken at that time indicated bilateral carpal tunnel syndrome. Dr. Furr performed a second left carpal tunnel release surgery on April 13, 2000. Dr. Furr performed a second right carpal tunnel release surgery on June 20, 2000. At his deposition on July 20, 2004, Dr. Furr reiterated his opinion from his August 9, 2000 affidavit that plaintiff's bilateral carpal tunnel syndrome was causally related to his employment as a firefighter. Dr. Furr also stated that plaintiff's job duties placed him at a slightly increased risk of contracting bilateral carpal tunnel syndrome as compared to members of the general public. Further, Dr. Furr explained that plaintiff's job duties aggravated or exacerbated his preexisting bilateral carpal tunnel disease causing it to become disabling.
25. The Commission gives greater weight to the expert opinions of Drs. Poehling, Koman, and Noah than to those of Dr. Furr. Therefore, the Full Commission finds that plaintiff's employment as a firefighter did not place him in a position of greater risk than the general public of contracting carpal tunnel syndrome and did not cause plaintiff to develop the compensable occupational disease of carpal tunnel syndrome.
26. During his time out of work, plaintiff has received short-term disability benefits, fully funded by the employer, which as of the date of the hearing before the Deputy Commissioner totaled $4,207.48. *Page 9 
 * * * * * * * * * * *
In accordance with the directives of the North Carolina Court of Appeals and based upon the findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), a plaintiff must prove that the disease is characteristic of individuals engaged in the particular trade or occupation in which he was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and plaintiff's employment. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tultex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983); Hansel v. ShermanTextiles, 304 N.C. 44, 283 S.E.2d 101 (1981); Booker v. Duke MedicalCenter, 297 N.C. 458, 256 S.E.2d 189 (1979). Further, a plaintiff seeking to prove that he has a compensable occupational disease must show that the employment exposed him to an increased risk of contracting, not merely aggravating, the condition. Chambers v. TransitMgmt., 360 N.C. 609, 636 S.E.2d 553 (2006).
2. In this case plaintiff failed to establish by the greater weight of the evidence that his condition was characteristic of and peculiar to his employment with defendant-employer, that he was at an increased risk of developing the condition due to his employment, or that his condition was caused by the work duties. N.C. Gen. Stat. § 97-53(13); Rutledge v.Tultex Corp., supra; Booker v. Duke Medical Center, supra.
3. Plaintiff's claim is not compensable under the provisions of the North Carolina Workers' Compensation Act and, therefore, plaintiff is not entitled to workers' compensation benefits. N.C. Gen. Stat. § 97-2et seq. *Page 10 
 * * * * * * * * * * *
In accordance with the directives of the North Carolina Court of Appeals and based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for workers' compensation benefits and medical expenses, under the law, must be and is HEREBY DENIED.
2. Each side shall bear its own costs.
This 30th day of January, 2008.
S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/______________________ DANNY LEE McDONALD COMMISSIONER
DISSENTING:
 S/______________________ CHRISTOPHER SCOTT COMMISSIONER *Page 11