* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence, or to re-hear the parties or their *Page 2 
representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-Trial Agreement and at the hearing as:
STIPULATIONS
1. Plaintiff is Evette Michelle Stroupe.
2. Defendant-Employer is BIC Corporation.
3. Defendant-Carrier on the risk is Liberty Mutual Insurance Company.
4. An employer-employee relationship existed at all relevant times between Defendant-Employer and Plaintiff.
5. Subsequent to the hearing, the parties stipulated that Plaintiff's average weekly wage was $604.00, yielding a compensation rate of $402.68 per week.
6. The date of the injury at issue is May 12, 2005.
7. Defendant-Employer regularly employs three or more employees, and all parties are bound by the North Carolina Workers' Compensation Act.
8. The Industrial Commission has jurisdiction over the parties and over the subject matter of this claim.
9. The parties stipulated to the following documentary evidence: Stipulated Exhibit number one (1)-I.C. Forms and Orders; medical records; and discovery responses.
10. During the hearing of this matter, the parties stipulated that Defendant-Employer fully funded the short-term disability and the long-term disability payments that Plaintiff received. *Page 3 
 ISSUE
The issues for determination are:
1. Whether Plaintiff suffered a compensable injury?
2. If so, to what benefits is Plaintiff entitled under the Workers' Compensation Act?
 * * * * * * * * * * *
Based upon all of the competent evidence adduced from the record, and the reasonable inferences drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was 38 years old and was a high school graduate. Plaintiff's prior work experience consists of working at a grocery store as a clerk, a series of jobs in the textile industry, and as an office manager for a towing company. Plaintiff began working for Defendant-Employer on January 31, 2005.
2. Defendant-employer distributes pens, pencils and lighters. Plaintiff's position with Defendant-Employer consisted of "picking orders," which required her to pull boxes of cigarette lighters, pencils, and pens off of a conveyor belt and to stack them. These boxes typically weighed between one (1) and 10 pounds. In order to perform her job duties, Plaintiff had to twist, turn, and bend over often. Plaintiff worked eight (8) hour shifts, but typically she would work overtime, and sometimes she would work six (6) or seven (7) days a week. Eventually, Plaintiff transferred to the "UPS" area of Defendant-Employer, where she did the same type of job activity, but walked less. In addition to pulling boxes off of a conveyor belt and putting them onto racks, this position also required Plaintiff to do some overhead lifting, with most of the lifting from chest level and above. *Page 4 
3. Prior to May 12, 2005, Plaintiff neither experienced problems with nor did she complain about her back, and she did not seek medical treatment for any injuries or ailments to her back. On May 12, 2005, Plaintiff began her shift for Defendant-Employer at approximately 4:00 a.m. She performed her usual job of picking orders in the UPS section. At approximately 10:00 a.m. or 11:00 a.m. on May 12, 2005, Plaintiff began feeling pain in her lower spine. At the time she began feeling pain, Plaintiff was pulling boxes of cigarette lighters, pens, and pencils out of racks and wrapping them together with a plastic strap, and then putting them onto a conveyor belt that would take the boxes down to another area of the plant, where she would lift the boxes off of the conveyor belt and place them onto a pallet. That day, Plaintiff testified that the boxes she was handling weighed between 10 and 20 pounds.
4. Over the next two (2) days, her back pain worsened, and Plaintiff also began to experience pain radiating down to her left leg. While at work on May 15 2005, Plaintiff's condition progressed to the point where she could no longer stand or pick up items. Plaintiff had to stop working and be assisted to her car by a co-worker, Mr. David Grant. Plaintiff testified that she told Mr. Grant that she hurt her back at work; however, Mr. Grant testified that he specifically asked Plaintiff how she hurt her back, and that Plaintiff indicated to him that she did not know when she hurt her back, and that she did not know whether the injury occurred at work or at home.
5. Ms. Danette Kennedy, a human resources supervisor for Defendant-Employer, interviewed Plaintiff on May 15, 2005 after Mr. Grant assisted Plaintiff to her car. Plaintiff informed Ms. Kennedy that she injured her back and needed to get to a doctor. Plaintiff testified that she informed Ms. Kennedy that she injured her back while at work, although Ms. Kennedy testified that Plaintiff told her that she did not know when she hurt her back, and that she did not *Page 5 
know whether she hurt her back at work or at home. Ms. Kennedy directed Plaintiff to go to the emergency department at Presbyterian Hospital in Huntersville, North Carolina. Ms. Kennedy also provided Plaintiff with some paperwork to take to the hospital, which included a note that stated that Plaintiff probably injured herself at home.
6. Per Ms. Kennedy's instruction, Plaintiff went directly to the emergency department at Presbyterian Hospital on May 15, 2005. The initial triage assessment states that Plaintiff had complaints of back pain that "started just prior to arrival." The triage notes further indicate that Plaintiff believed she had a lifting injury that worsened by standing and movement, and improved by lying down. The physician examining Plaintiff documented that Plaintiff presented with complaints of back pain that had been present for "about 5 days," that the mechanism of injury was lifting, turning, and bending, and that the injury occurred at work. The attending physician diagnosed Plaintiff with a lumbar strain with probable sciatica, and released her with the restrictions of no bending, stooping, or lifting for the next five (5) days, or until the pain resolved.
7. On or about May 18, 2005, Ms. Kennedy gave Plaintiff a form to fill out entitled "Worker Compensation Information," wherein Plaintiff wrote that she injured her lower back while lifting boxes at around 10:00 a.m. on May 13, 2005 while at work for Defendant-Employer. [Note 1] Later, Plaintiff testified in her deposition that she mistakenly wrote May 13, 2005, but meant to write May 12, 2005 as the date of the injury.
8. Plaintiff presented to Dr. Grace C. Pamintuan of Grace Family Care, P.C. for follow-up care beginning on May 18, 2005. Plaintiff gave a history to Dr. Pamintuan of the gradual onset of pain while lifting boxes at work on May 12, 2005. On May 22, 2005, Plaintiff underwent lumbar magnetic resonance imaging (MRI) that revealed mild apex left *Page 6 
thoracolumbar scoliosis and a mild left disc bulge at L1-L2, but the presence of no fractures or subluxations.
9. Dr. Pamintuan referred Plaintiff to Dr. William H. Jarman, Jr., who was an orthopaedic surgeon at Carolina Orthopaedic Sports Medicine. She presented to Dr. Jarman on June 9, 2005 and gave a history of having "a very active job," and of "lifting, pushing, and various physical activities" on May 12, 2005 that caused an onset of pain somewhere between 10:00 a.m. and 11:00 a.m. Dr. Jarman opined that Plaintiff suffered from left sciatica with degenerative disc disease at T12-L1 and L1-L2, and so he continued Plaintiff on bedrest (out of work) status and referred her to physical therapy, among other things. Plaintiff returned to see Dr. Jarman several times thereafter, and on June 23, 2005, he ordered that she continue with her pain and other medications, obtain epidural steroid injections, and that she continue on bedrest status.
10. Plaintiff began receiving epidural steroid injections at Southeast Pain Care on July 1, 2005, ultimately receiving a series of three (3) injections through August 9, 2005. Plaintiff returned to Dr. Jarman on July 25, 2005, and indicated that the epidural steroid injections were helping some, but that she was still having significant pain. On August 23, 2005, Dr. Jarman noted that because Plaintiff was still suffering significant pain, he wanted to refer her to neurosurgeon Dr. William D. Hunter.
11. Plaintiff presented to Dr. Hunter on August 31, 2005, at which time he recommended a computed tomography (CT) myelogram that Plaintiff underwent on September 19, 2005. The CT myelogram showed focal degenerative disc disease and posterior disc protrusion at L1-L2 with mild central canal stenosis, a conjoined nerve root on the right side involving L-5 and S-1, and posterior disc protrusion at T-11-T-12, creating mild central canal *Page 7 
stenosis. Given the findings of the C.T. myelogram, Dr. Hunter did not feel that Plaintiff was a surgical candidate. Plaintiff returned to Dr. Jarman on October 13, 2005, and requested that she be permitted to return to work, which Dr. Jarman opined was appropriate, subject to a 20 pound lifting restriction.
12. Plaintiff sent the release to return to work to Defendant-Employer, but received no response. As such, Plaintiff searched for work elsewhere, and ultimately obtained a job with Southfork Industries as a compactor operator, where she began working on February 22, 2006, which was the first time she worked since initially going out of work for her May 12, 2005 injury.
13. While Plaintiff was out of work, she received short-term disability and long-term disability payments, in the amount of $5,219.38. Since Defendant-Employer fully funded these disability payments, Defendant-Employer is entitled to a credit for these payments.
14. Plaintiff underwent an independent medical evaluation (IME), performed by orthopaedic surgeon Dr. Robert Blake, who was in the same medical practice as Dr. Jarman, on June 14, 2006. Following his examination, Dr. Blake opined that Plaintiff had a lumbar strain and sprain with left-sided sciatica, and that she experienced an aggravation of pre-existing degenerative disc disease in the lumbar spine. Dr. Blake further opined that Plaintiff's job, as described to him, was the cause of the aggravation of Plaintiff's pre-existing condition, and that the aggravation caused the symptoms that resulted in Plaintiff's disability from work. Finally, Dr. Blake opined that Plaintiff was at maximum medical improvement, that she should be permanently restricted to light to medium duty work (based upon Department of Labor standards), and that she had a five (5) percent permanent partial disability to her back. *Page 8 
15. The Full Commission finds that Plaintiff's testimony, and the notations she wrote on the "Worker Compensation Information" form supplied by Defendant-Employer on or about May 18, 2005, regarding the events leading up to her back injury on May 12, 2005 at Defendant-Employer, as well as the events subsequent to the back injury, to be credible, and gives greater weight to her testimony and handwritten notations regarding where and how she injured her back on May 12, 2005.
16. Based upon the greater weight of the lay and expert medical testimony, the Full Commission finds as fact that on May 12, 2005, sometime between the hours of 10:00 a.m. and 11:00 a.m., Plaintiff suffered a specific traumatic incident to her lower back, causing an onset of lower back pain. This specific traumatic incident arose out of and in course of the performance of Plaintiff's job duties for Defendant-Employer, and resulted in an aggravation of a pre-existing condition (degenerative disc disease), which, in turn, caused Plaintiff to become temporarily disabled from employment. This specific traumatic incident arose as a result of a specific, discernable chain of events occurring between the hours of 10:00 a.m. and 11:00 a.m., which Plaintiff described as lifting boxes of cigarette lighters, pens, and pencils weighing between 10 and 20 pounds out of racks and wrapping them together with a plastic strap, and then twisting, turning, and bending to place these boxes onto a conveyor belt that would take the boxes down to another area of the plant, where she would then lift the boxes off of the conveyor belt and place them onto a pallet. Further, the Full Commission finds that the greater weight of the evidence establishes that Plaintiff's injury arose from a specific, discernable chain of events occurring sometime between the hours of 10:00 a.m. and 11:00 a.m., even though Plaintiff's initial onset of pain during these stated hours was not severe enough to cause her to completely stop working, *Page 9 
and even though Plaintiff's pain, in the days and hours subsequent to her initial injury, worsened in a gradual manner.
17. As of May 12, 2005, Plaintiff's average weekly wage was $604.00, yielding a compensation rate of $402.68 per week.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On May 12, 2005, sometime between the hours of 10:00 a.m. and 11:00 a.m., Plaintiff suffered a specific traumatic incident to her lower back, causing an onset of lower back pain. This specific traumatic incident arose out of and in course of the performance of Plaintiff's job duties for Defendant-Employer, and resulted in an aggravation of a pre-existing condition (degenerative disc disease), which, in turn, caused Plaintiff to become temporarily disabled from employment. This specific traumatic incident arose as a result of a specific, discernable chain of events occurring between the hours of 10:00 a.m. and 11:00 a.m., which Plaintiff described as lifting boxes of cigarette lighters, pens, and pencils weighing between 10 and 20 pounds out of racks and wrapping them together with a plastic strap, and then twisting, turning, and bending to place these boxes onto a conveyor belt that would take the boxes down to another area of the plant, where she would then lift the boxes off of the conveyor belt and place them onto a pallet. The greater weight of the evidence establishes that Plaintiff's injury arose from a specific, discernable chain of events occurring sometime between the hours of 10:00 a.m. and 11:00 a.m., even though Plaintiff's initial onset of pain during these stated hours was not severe enough to cause her to completely stop working, and even though Plaintiff's pain, in the days and hours *Page 10 
subsequent to her initial injury, worsened in a gradual manner. N.C. Gen. Stat. § 97-2(6) (2007); Chambers v. Transit Management,360 N.C. 609,636 S.E.2d 553 (2006); Fish v. Steelcase, Inc., 116 N.C. App. 703,449 S.E.2d 223 (1994); Roach v. Lupoli Constr. Co., 88 N.C. App. 271,362 S.E.2d 823 (1987).
2. In order to establish a specific traumatic incident under North Carolina law, a claimant must show that the injury did not develop gradually, but rather, at a judicially cognizable time, which is a time capable of being judicially known and determined. Livingston v. James C.Fields Co., 93 N.C. App. 336, 337 S.E.2d 788, (1989). The burden of establishing a specific traumatic incident at a judicially cognizable time does not compel the claimant, however, to isolate the incident to a specific hour, or even to a specific day. Fish v. Steelcase, Inc.,116 N.C. App. 703, 449 S.E.2d 223 (1994). Furthermore, the claimant does not have to show that the injury and the resultant pain occurred simultaneously, or even during the workday in which the injury occurred.Roach v. Lupoli Constr. Co., 88 N.C. App. 271, 362 S.E.2d 823 (1987). In addition to establishing a judicially cognizable time in which the injury occurred, a claimant must establish that some inciting event or incident caused the injury, rather than just a gradual deterioration in the claimant's condition. Chambers v. Transit Management, 360 N.C. 609,636 S.E.2d 553 (2006); Fish v. Steelcase, Inc., 116 N.C. App. 703,449 S.E.2d 223 (1994).
3. In this case, Plaintiff satisfied all of these requirements to establish a specific traumatic incident. Plaintiff's credible testimony establishes not only a narrow, one (1) hour window in which the injury occurred, but also establishes that the injury resulted from a specific, discernable chain of events during the specified one (1) hour time frame, unlike in Chambers, where the plaintiff did nothing more than sit and drive a bus. Chambers, 360 N.C. 609, 636 S.E.2d 553 (2006). The specific chain of events Plaintiff described performing when she *Page 11 
initially felt pain, which consisted of lifting boxes of cigarette lighters, pens, and pencils weighing between 10 and 20 pounds out of racks and wrapping them together with a plastic strap, and then twisting, turning, and bending to place these boxes onto a conveyor belt that would take the boxes down to another area of the plant, where she would then lift the boxes off of the conveyor belt and place them onto a pallet, included physical activity which Dr. Robert Blake testified would be consistent with a mechanism of injury capable of producing the injuries that he determined Plaintiff sustained.
4. Reading the Chambers and Fish holdings requiring the establishment of an inciting event or incident, rather than a gradual deterioration, in tandem with the Roach holding, which does not require a claimant to experience the injury and the pain simultaneously, or even on the same day, it would reasonably follow that so long as Plaintiff establishes that she sustained an injury to her back during a particular time period in which some specific, inciting event occurred, then the fact that the severity of the pain (and not the pain itself), worsened in a gradual manner is not a barrier to compensability of her claim.Chambers, 360 N.C. 609, 636 S.E.2d 553 (2006); Roach, 88 N.C. App. 271,273, 362 S.E.2d 823, 824 (1987). In Roach, the plaintiff testified that although he felt weak and tired by the time he finished lifting some boards, he did not experience pain until sometime later after he lifted the boards. Roach, 88 N.C. App. 271, 273, 362 S.E.2d 823, 824 (1987). Based upon that set of facts, the North Carolina Court of Appeals noted: "[l]ogic dictates that injury and pain do not have to occur simultaneously . . . to establish that he [Roach] sustained a compensable injury." Id., 88 N.C. App. 271, 273, 362 S.E.2d 823, 825
(1987). Here, Plaintiff actually did feel pain contemporaneously with the lifting, twisting, and bending she did with the boxes; however, the pain did not become severe enough to cause her to completely quit working until days later. *Page 12 
5. As a result of Plaintiff's compensable injury, Plaintiff is entitled to temporary total disability compensation at the rate of $402.68 per week for the period from May 15, 2005, when Plaintiff's pain caused her to no longer be able work due to her May 12, 2005 injury, through February 22, 2006, when Plaintiff went to work for another employer. N.C. Gen. Stat. § 97-29 (2007).
6. Defendants are entitled to a credit in the amount of $5,219.38 for short-term disability and long-term disability payments made to Plaintiff during the period of her compensable disability from May 15, 2005 through February 22, 2006. N.C. Gen. Stat. § 97-42 (2007).
7. Plaintiff is entitled to permanent partial disability compensation benefits at the rate of $402.68 for 15 weeks for the 5 (five) percent permanent partial disability rating assigned to her back.
8. Plaintiff is entitled to have Defendants pay for medical expenses incurred or to be incurred as a result of her compensable injury that may be required to provide relief, effect a cure, or lessen the period of disability, subject to the statute of limitations prescribed in N.C. Gen. Stat. §§ 97-2(19); 97-25.1 (2007).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, and the credit due Defendants for the short-term disability and the long-term disability payments already made, Defendants shall pay temporary total disability compensation to Plaintiff at the rate of $402.68 *Page 13 
per week for the period from May 15, 2005 through February 22, 2006. This compensation, having already been accrued, shall be paid in a lump sum.
2. Subject to the attorney's fee herein approved, Defendants shall pay to Plaintiff a total of $6,040.20 in benefits for the permanent partial disability rating of five (5) percent to her back.
3. A reasonable attorney's fee of 25 percent of the compensation awarded to Plaintiff in Paragraph one (1) and in Paragraph two (2), above, is hereby approved to be deducted from sums due Plaintiff and paid directly to Plaintiff's counsel.
4. The amount of $5,219.38 shall be deducted from the accrued temporary total disability benefits due to Plaintiff as an offset for the short-term disability and the long-term disability payments made to Plaintiff by Defendants during the period of her compensable disability.
5. Defendants shall pay medical expenses incurred or to be incurred when bills for the same have been approved, in accordance with the provisions of the Workers' Compensation Act.
6. Defendants shall pay the costs.
This the __ day of June 2008.
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 CONCURRING: *Page 14 
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ DIANNE SELLERS COMMISSIONER