***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Accordingly, the Full Commission affirms with modifications, the Opinion and Award of Deputy Commissioner Deluca.
 ***********
The Full Commission finds as fact and concludes as matters of law the following stipulations of the parties:
 STIPULATIONS *Page 2 
1. All parties are properly before the North Carolina Industrial Commission, and are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On the alleged date of accident, September 6, 2007, an employment relationship existed between Plaintiff and Defendant-Employer.
3. At all times pertinent hereto, Defendant-Employer has been insured by General Casualty Insurance Co. for its workers' compensation risk.
4. On September 6, 2007, Plaintiff earned an average weekly wage of $815.47, yielding a compensation rate of $ 543.67.
5. September 6, 2007 is stipulated to be the date of the alleged accident within the meaning of the Workers' Compensation Act, for the purposes of an award in this claim, being the first date Plaintiff missed time from work due to the alleged occupational disease.
6. Plaintiff last worked on Friday, September 7, 2007.
7. The contested issues of Plaintiff are as follows:
 a. Whether Plaintiff's severe invasive MRSA infection was an "occupational disease" within the meaning of N.C. Gen. Stat. § 97-53 (13);
 b. Whether, as a consequence of this occupational disease, both of the Plaintiff's legs were amputated above the knee, entitling him to permanent and total disability benefits pursuant to N.C. Gen. Stat. § 97-31 (17);
 c. Whether, as a consequence of this occupational disease, Plaintiff sustained permanent injury to both of his lungs, urethra, heart and circulatory system, and stomach/ digestive system, which are important bodily organs, entitling him to equitable awards pursuant to N.C. Gen. Stat. § 97-31 (24); *Page 3 
 d. Whether, as a consequence of this occupational disease, Plaintiff is entitled to medical compensation within the meaning of N.C. Gen. Stat. § 97-2 19).
8. Defendants contend that the issues to be determined by this hearing are as follows:
 a. Whether plaintiff's MRSA infection was an occupational disease within the meaning of N.C. Gen. Stat. § 97-53 (13);
 b. If so, what are the compensable consequences?
9. Stipulated Exhibits 1-4 were entered into the record.
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who is 50 years of age, was employed as an electrician with Defendant-Employer off and on for 20 years. He is a lifelong smoker with chronic obstructive pulmonary disease (COPD) and has an Alpha 1-antitrypsin deficiency.
2. In 2007, Plaintiff was working at Duke University Medical Center (DUMC) on a project that involved the construction of a new emergency room and the demolition of the old emergency room. The job entailed tearing out and replacing the wiring and receptacles for three separate electrical systems serving the emergency rooms. Plaintiff personally handled these tasks alongside those he supervised. When necessary, they wore gloves that gave them some protection, but took them off when they needed their fingers free to manipulate small objects. Plaintiff and other electricians accumulated the typical cuts and abrasions from cutting to size *Page 4 
and handling wires and metal conduit pipe installed at the DUMC site, particularly on their hands and arms. Plaintiff was exposed to dust as the work site was swept daily.
3. DUMC's emergency rooms continued to operate during the project, so it was divided into phases to accommodate patients being seen in part of the emergency department while adjacent areas were being renovated. At least once a week, Plaintiff would be escorted by DUMC staff into the active emergency room area to see and measure electrical installations they intended to replicate in the area under construction or to fix any problems with the work they had done there. Plaintiff made incidental contact with things such as countertops and bedrails.
4. Some time in the spring of 2007, plaintiff worked almost the entire night while DUMC moved from the old emergency room to the new addition. Within hours after the medical personnel left, taking only patients and beds, plaintiff and his crew removed the other furniture and fixtures, and began taking out the old wiring, cabinetry, ceilings, and walls. The objects or surfaces in this area had not been cleaned or disinfected. As part of the move, Plaintiff helped wire metal detectors in the new emergency room and helped move a chair, which he described as a dental type chair, from the old emergency room to the new addition. When they lifted the chair, Plaintiff described a dried fluid under the chair that could have been cola or blood. As part of the demolition process, Plaintiff also removed wiring from walls and worked in an interstitial space above the emergency department.
5. In August or September of 2007, Plaintiff had a headache or cold-like symptoms at the end of a work day.
6. In early September 2007, Plaintiff complained of flu-like symptoms. On Thursday, September 6, 2007 he missed work because of this illness, but was able to work Friday morning before flying to Nashville, Tennessee to attend a wedding. When he arrived at *Page 5 
the hotel in Nashville, Plaintiff did not feel well so he went to lie down. Plaintiff stayed in bed hoping he would feel better in a few minutes.
7. Plaintiff's condition declined and he was eventually taken to Southern Hills Medical Center. Upon admission to the hospital, Plaintiff was in respiratory failure and given a ten percent chance of survival. As a result of organ failure and sepsis, Plaintiff was given pressors.
8. On September 27, 2007, Plaintiff was discharged and immediately transferred to Durham Regional Medical Center. His diagnoses at discharge were Methicillin-Resistant Staphylococcus Aureus (MRSA) pneumonia, septic shock, respiratory failure, multi-organ failure, chronic obstructive pulmonary disease, bilateral gangrenous changes to lower extremities, anemia, thrombocytopenia, acute renal failure requiring hemodialysis, and shocked liver.
9. While at Durham Regional Medical Center, Plaintiff underwent above the knee amputations of his two lower extremities.
10. According to Dr. David Weber, an expert in infectious disease, MRSA is a staph aureus that is resistant to antibiotics called methicillin and is common in both the community and hospitals. Staph aureus is a human pathogen and, as a result, it does not grow and survive in the environment for extended periods of time.
11. Dr. Weber testified that MRSA is transmitted most commonly by direct personal contact. When a person develops a MRSA infection, he or she has gone through both colonization and then infection. Dr. Weber testified that MRSA normally lives on the skin and in the noses of individuals. Depending upon the patient population and the study, two to ten percent of the general population will carry MRSA in their nose or on their skin, particularly the *Page 6 
moister parts like the groin and the axilla, which Dr. Weber described as colonization. Dr. Weber testified that people can be colonized for years or transiently colonized for a few weeks.
12. Dr. Weber testified that there is no way to be sure when or where someone would be colonized and that plaintiff could have been colonized for one day or 20 years.
13. Dr. Weber also testified that Plaintiff's MRSA was a community-based MRSA as opposed to a hospital-based MRSA, which is consistent with the diagnosis contained in the records from Dr. Greenblatt. He went on to state that plaintiff could have become colonized at church, playing sports with his children, through contact with his wife, or through contact with anybody at any point in time.
14. Dr. Weber further testified that once a person is colonized with MRSA, if there is damage to the person's host defenses, an infection can develop. These infections can show up as a boil on the skin, cellulitis, pneumonia or septic arthritis, along with other conditions.
15. Dr. Weber opined that MRSA was colonized in Plaintiff's nose and entered his lungs, and that Plaintiff had several risk factors that predisposed him to pneumonia. Dr. Weber testified
 . . . So my belief is that this gentleman aspirated small amounts of his upper airway secretions, which contained MRSA. He has at least several major risk factors for predisposing him to pneumonia, particularly smoking. And the major effect smoking has is on those little cilia that beat — carry things up. It paralyzes them. And the other one is he had underlying Alpha-1 antitrypsin disease, a disease that attacks the architecture of the lung and causes emphysema. The combination of smoking and Alpha-1 antitrypsin is particularly deadly and enhances the damages to the lungs.
 He had other diseases that may have affected his ability to mounting normal host response, such as chronic hepatitis C. And in the setting of those host defense abnormalities, he developed pneumonia. And then, as a consequence of his pneumonia, he went on to develop sepsis, meaning the bacteria spread to the blood and, obviously, as a consequence of that, was — was very, very ill, *Page 7 
gravely ill. Many people who would have MRSA in the lungs with sepsis would — would not have survived that situation.
16. There is no evidence that plaintiff had any type of injury to his skin or infection on his skin when Plaintiff was diagnosed with pneumonia.
17. When asked whether plaintiff's employment caused his MRSA infection, Dr. Weber responded that it did not cause his medical condition in any way. Dr. Weber also opined that plaintiff's employment did not place him at an increased risk of developing a MRSA infection.
18. Dr. Henry Masur, an expert witness in the areas of internal medicine and infectious disease, testified that Plaintiff was very likely exposed to MRSA during his employment, and that MRSA could have gotten on his body by contact with either contaminated objects or co-workers, who were equally exposed to contamination and colonization. Dr. Masur also testified that MRSA could have entered Plaintiff's body and started the infection through cuts and abrasions or by aspiration from his nose into his lungs, which were more susceptible to MRSA infection because of COPD.
19. Dr. Masur opined that Plaintiff's employment renovating Duke emergency rooms in 2007 put Plaintiff at increased risk of acquiring MRSA compared to persons working in non-health-care related settings.
20. Dr. Lawrence H. Greenblatt, the Medical Director of Duke Outpatient Clinic in Durham is an expert in internal medicine. Dr. Greenblatt has been plaintiff's physician for at least 14 years, consulted with Plaintiff's treating physicians in Durham, and has treated Plaintiff since his discharge from Durham Regional Hospital. Dr. Greenblatt testified, based on radiological evidence of scarring in both lungs and test results showing significant decrements in lung function, that Plaintiff had suffered significant permanent impairment of each lung as a *Page 8 
result of the MRSA infection. As a result of these additional impairments to his lungs, Plaintiff would not be able to sustain the exertion necessary to perform his former employment. Dr. Greenblatt also opined that this impairment would impact plaintiff's mobility with artificial legs, and he had asked Plaintiff's medical insurer to evaluate and consider him for more advanced prosthetic legs that would be less strenuous to use.
21. Based upon the greater weight of the credible evidence, the Full Commission finds that plaintiff's employment with defendant-employer placed him at increased risk for developing MRSA. However, the greater weight of the evidence fails to establish a causal link between plaintiff's employment and his development of MRSA.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission make the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving the existence of an occupational disease. Gay v. J.P. Stevens Co.,79 N.C. App. 324, 331, 339 S.E. 2d 490, 494 (1986). In order to establish an occupational disease under N.C. Gen. Stat. § 97-53(13), Plaintiff must establish that (1) the condition is characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; that (2) the condition is not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and that (3) there is "a causal connection between the disease and the [claimant's] employment."Rutledge v. Tultex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983).
2. To satisfy the first and second elements it is not necessary that the disease originate exclusively from or be unique to the particular trade or occupation in question. All *Page 9 
ordinary diseases of life are not excluded from the statute's coverage. Rutledge v. Tultex Corp./Kings Yarn,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded.Id.
3. In cases where the employment exposed the worker to a greater risk of contracting the disease than the general public, the first two elements are satisfied. Chamber v. Transit Management,360 N.C. 609, 636 S.E.2d 553 (2006) (citing Rutledge v.Tultex Corp./Kings Yarn,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983)). "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workman's compensation."Chamber v. Transit Management,360 N.C. 609, 636 S.E.2d 553 (2006) (citing Booker v. DukeMed. Ctr., 297 N.C. 458, 475, 256 S.E.2d 189, 200 (1979)).
4. The greater weight of the evidence establishes that plaintiff's employment with defendant-employer placed him at increased risk for the development of MRSA. Id. However, the greater weight of the evidence fails to establish a causal link between the employment and Plaintiff's development of MRSA. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003).
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for workers compensation benefits is DENIED.
2. Defendants shall bear the cost, including expert witness fees of $3,200.00 to Dr. Masur, $2,800.00 to Dr. Weber, and $500.00 to Dr. Greenblatt. *Page 10 
This the 2nd day of December 2010.
 S/___________________
 STACI T. MEYER
 COMMISSIONER
CONCURRING:
S/___________________ BERNADINE S. BALLANCE COMMISSIONER
S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1