IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-778

Filed: 6 March 2018

North Carolina Industrial Commission, I.C. No. 13-005153

WILLARD BRIGGS, Employee, Plaintiff

v.

DEBBIE'S STAFFING, INC., Employer, N.C. INS. GUAR. ASS'N, Carrier; EMPLOYMENT PLUS, Employer, N.C. INS. GUAR. ASS'N; and PERMATECH, INC., Employer, CINCINNATI INS. CO., Carrier, Defendants.

Appeal by plaintiff from opinion and award entered 31 March 2017 by the North Carolina Industrial Commission. Heard in the Court of Appeals 29 November 2017.

*Wallace and Graham, P.A., by Edward L. Pauley, for plaintiff-appellant.*

*Teague Campbell Dennis & Gorham, LLP, by John A. Tomei and Matthew D. Flammia, for defendants-appellees Employment Plus and NCIGA.*

*Muller Law Firm, PLLC, by Tara Davidson Muller, and Anders Newton, PLLC, by Gregg Newton, for defendants-appellees Permatech and Cincinnati Insurance.*

*Cranfill Sumner & Hartzog LLP, by Buxton S. Copeland and Tracy C. Myatt, for defendants-appellees Debbie's Staffing and NCIGA.*

DAVIS, Judge.

In this workers' compensation appeal, we revisit the issue of whether an employee is required to present expert medical evidence in order to establish that the conditions of his employment placed him at a greater risk than members of the

general public for contracting a disease. Willard Briggs appeals from the opinion and award of the North Carolina Industrial Commission denying his claim for workers' compensation benefits in which he alleged that his asthma resulted from his working conditions. Because we conclude the Industrial Commission properly found that Briggs failed to offer expert medical evidence showing that his job actually placed him at a greater risk of contracting asthma, we affirm.

## Factual and Procedural Background

The facts of this case involve events that occurred during Briggs' employment with Permatech, Inc. ("Permatech") and two staffing agencies — Debbie's Staffing, Inc. ("Debbie's Staffing") and Employment Plus. Briggs worked for Permatech from 14 June 2010 to 25 April 2012. Permatech and Debbie's Staffing served as his joint employers from 14 June 2010 to 22 April 2012. Permatech and Employment Plus served as his joint employers from 23 April 2012 to 25 April 2012.

Permatech is a refractory manufacturer that makes "precast troughs and molds that are used in the molten metal industry." Briggs worked as a ceramic technician at the Permatech facility in Graham, North Carolina. A portion of his time was spent working on a "Voeller" machine — a large, circular mixing machine containing a blade that mixes dry ingredients with water. Briggs also worked on "smaller molds in other areas of the plant or helping to cast small parts." The dry ingredients that were mixed in the Permatech machines included "alumina silicate,

cement (calcium aluminate), cristobalite, quartz, fused silica, fumed silica, and silicon carbide . . . ."

Due to the dusty environment created by the Voeller machine, Permatech employees were required to wear respiratory protection masks while working around the machine. Briggs was provided with a P95 mask, "which filters out 95 percent of the airborne particulate that is respirable." In addition, near the end of his employment at Permatech, he was given a P100 cartridge respirator, which "had a 99.9% filtration rate for airborne particulate."

Briggs was terminated from his employment at Permatech for attendance-related issues. He subsequently filed a Form 18 (Notice of Accident) on 5 November 2013, alleging that he had "developed COPD and asthma as a result of working as a Voeller technician . . . ." Employment Plus and Debbie's Staffing each filed a Form 61 in which they asserted that Briggs "did not suffer a compensable occupational disease arising out of and in the course of his employment . . . ."

On 8 October 2015, a hearing was held before Deputy Commissioner J. Brad Donovan. Briggs testified in support of his claim at the hearing. Depositions were later taken of Dr. Dennis Darcey and Dr. Douglas McQuaid as well as of two vocational experts.

Dr. McQuaid, a pulmonary and critical care physician employed by LeBauer HealthCare, testified that Briggs had come to his office complaining of shortness of

breath and wheezing. He opined that Briggs' condition had been caused by the substances he was exposed to at the Permatech facility. He conceded, however, that he was unaware of the fact that Briggs had (1) smoked cigarettes during breaks at work; (2) been given a respirator mask for use during work hours; (3) a history of marijuana usage; and (4) previously been treated for allergies with albuterol.

Dr. Darcey, the Division Chief of Occupational and Environmental Medicine and the Medical Director of the Occupational Medicine Clinic at Duke University, testified that Briggs' asthma likely predated his employment with Defendants because his medical records established that he "already had a reactive airway before he began working at the Permatech facility." He did state, however, his belief that Briggs' asthma had been aggravated during his employment at Permatech.

On 18 May 2016, the deputy commissioner issued an opinion and award concluding that "[b]ased upon the preponderance of evidence in view of the entire record . . . [Briggs] has met his burden and is temporarily totally disabled from employment as a result of his occupational disease and is entitled to temporary total disability compensation at the rate of $213.27 per week for the period beginning on 25 April 2012 and continuing." Defendants appealed to the Full Commission.

On 31 March 2017, the Full Commission issued an Opinion and Award reversing the deputy commissioner's decision and denying Briggs' claim for benefits.

Commissioner Bernadine S. Ballance dissented. On 4 April 2017, Briggs filed a timely notice of appeal.

**Analysis**

Appellate review of an opinion and award of the Industrial Commission is typically "limited to consideration of whether competent evidence supports the Commission's findings of fact and whether the findings support the Commission's conclusions of law." *Philbeck v. Univ. of Mich.*, 235 N.C. App. 124, 127, 761 S.E.2d 668, 671 (2014) (citation and quotation marks omitted). "The findings of fact made by the Commission are conclusive on appeal if supported by competent evidence even if there is also evidence that would support a contrary finding. The Commission's conclusions of law, however, are reviewed *de novo*." *Morgan v. Morgan Motor Co. of Albemarle*, 231 N.C. App. 377, 380, 752 S.E.2d 677, 680 (2013) (internal citation omitted), *aff'd per curiam*, 368 N.C. 69, 772 S.E.2d 238 (2015).

"For an injury or death to be compensable under our Workmen's Compensation Act it must be either the result of an 'accident arising out of and in the course of the employment' or an 'occupational disease.'" *Booker v. Duke Med. Ctr.*, 297 N.C. 458, 465, 256 S.E.2d 189, 194 (1979) (citation omitted). N.C. Gen. Stat. § 97-53(13) provides that a disease is considered occupational if it is "proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the

general public is equally exposed outside of the employment." N.C. Gen. Stat. § 97-53(13) (2017).

Our Supreme Court has held that in order

> [f]or a disease to be occupational under G.S. 97-53(13) it must be (1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a causal connection between the disease and the claimant's employment.

*Rutledge v. Tultex Corp./Kings Yarn*, 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983) (citation, quotation marks, and brackets omitted). The Supreme Court has made clear that "[a]ll ordinary diseases of life are not excluded from the statute's coverage. Only such ordinary diseases of life to which the general public is exposed equally with workers in the particular trade or occupation are excluded." *Id.* (citation omitted).

The first two prongs of the *Rutledge* test "are satisfied if, as a matter of fact, the employment exposed the worker to a greater risk of contracting the disease than the public generally." *Id.* at 93-94, 301 S.E.2d at 365 (citation omitted). "The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workmen's compensation." *Id.* at 94, 301 S.E.2d at 365 (citation and quotation marks omitted).

This Court has explained that

> [r]egardless of how an employee meets the causation prong

(i.e., whether it be evidence that the employment caused the disease or only contributed to or aggravated the disease), the employee must nevertheless satisfy the remaining two prongs of the *Rutledge* test by establishing that the employment placed him at a greater risk for *contracting* the condition than the general public.

*Futrell v. Resinall Corp.*, 151 N.C. App. 456, 460, 566 S.E.2d 181, 184 (2002) (citation omitted and emphasis added), *aff'd per curiam*, 357 N.C. 158, 579 S.E.2d 269 (2003).

In the present case, the Commission's Opinion and Award contained the following pertinent findings of fact:

> 1.    Plaintiff is a thirty-two-year-old high school graduate who worked primarily as a restaurant cook and lawn care worker before obtaining vocational training in a forestry fire fighter program through Job Corps.  Prior to Plaintiff's involuntary termination from the Job Corps program in 2008, he was noted to complain of wheezing during medical visits on May 30, 2007, July 27, 2007, and January 14, 2008.  Plaintiff was also prescribed Albuterol for his symptoms.

> 2.    Permatech is a refractory manufacturer which makes precast troughs and molds that are used in the molten metal industry.  Plaintiff worked at Permatech as a ceramic technician.  As a ceramic technician, less than half of Plaintiff's time was spent working on the "Voeller" machine.  The remainder of Plaintiff's time was spent working on smaller molds in other areas of the plant or helping to cast small parts.

> 3.    The Voeller machine is a big circular mixing machine which measures approximately 12 to 13 feet in diameter and contains a blade which mixes dry ingredients with water.  The dry ingredients which are mixed in the Voeller machine and the smaller molding machines Plaintiff would work with were composed of, *inter alia,*

alumina silicate, cement (calcium aluminate), cristobalite, quartz, fused silica, fumed silica, and silicon carbide, all materials which may cause upper respiratory irritation and can aggravate preexisting chronic lung conditions.

4. The dry ingredients were taken to the Voeller machine by a forklift operator, who maneuvers the bag or bin over a chute which measure[s] approximately 20 inches by 20 inches and was located at the top of the machine. Once the bag or bin was in place, about one or two feet above the chute, Plaintiff would cut a hole in the bottom to discharge the mix. A plume of dust would surround Plaintiff as each bag was emptied into the chute and would stay in the air approximately two to three minutes before it would settle. After the material and any needed chemicals were poured into the machine, its blades would spin, and then water was added in an amount that the chemist of the plant directed. Operation of the Voeller machine and cleaning it out created a dusty environment, but not to the extent or magnitude depicted by Plaintiff in his testimony. While Plaintiff testified that he dumped 10 to 20 bins or bags per day, Permatech records show that the above-described process occurred on average 1.9 times per day.

5. Plaintiff was required to wear respiratory protection when working around the Voeller machine. Permatech provided Plaintiff with a P95 mask, which OSHA has deemed a respirator and which filters out 95 percent of the airborne particulate that is respirable. Plaintiff wore the P95 mask as required. Towards the end of Plaintiff's employment at Permatech, he was provided with a P100 cartridge respirator, which had a 99.9% filtration rate for airborne particulate.

6. Dust sampling results for testing done at Permatech, including personal air monitoring, were all well below OSHA's permissible exposure limits, except in the Moldable Department, where Plaintiff never worked. The results were also well below the "occupational

exposure limits" which Permatech's predecessor in interest, Alcoa, established internally and which were more stringent than those set forth by OSHA. The air sampling results also do not take into account the ten-fold protection afforded by the P95 mask Plaintiff was required to wear. While the testing relied upon by Defendants was done prior to Plaintiff's employment at Permatech, there have not been any significant changes in weight or equipment usage up to and through the time Plaintiff worked there, so the same testing results would be expected. Permatech has never been cited by OSHA for exceeding the regulatory exposure limits for dusts and chemicals, and no employee other than Plaintiff has alleged an occupational lung disease from employment at Permatech.

7. Plaintiff alleges that his breathing problems began in 2011 while working at the Permatech facility and developed gradually thereafter. However, he never complained of breathing problems to anyone at Permatech or to any medical provider when he was working at Permatech. Moreover, contrary to what he subsequently reported to medical providers, Plaintiff continued to smoke cigarettes during the time he worked at Permatech.

8. On July 18, 2012, almost three months after he was terminated from his employment at Permatech for attendance issues, Plaintiff presented to the Emergency Department at University of North Carolina Hospitals complaining of wheezing and shortness of breath. Plaintiff reported that he was experiencing shortness of breath since November 2011, that at onset he may have had some cold symptoms, that he initially believed he had developed bronchitis, but then his symptoms became persistent. He also reported using asthma medications and that his symptoms appeared to improve with Albuterol. It is unclear from the record who had prescribed the asthma medications he was taking or how long he had been taking them. Plaintiff underwent a chest x-ray and EKG and the attending physician ruled out the possibility of interstitial lung disease.

. . . .

11.     Plaintiff began treatment with Dr. Douglas McQuaid, who is board-certified in internal medicine, pulmonary medicine, and critical care medicine, beginning April 22, 2014 and continuing through September 2014. Plaintiff was evaluated for the purpose of establishing care for asthma, a condition he had previously had medical treatment for, including Albuterol. Plaintiff reported a history of smoking approximately one-quarter pack per week for 3 years, quitting in 2005. Plaintiff also reported that he was directly exposed to silica fibers and chemicals containing iron particles on a daily basis at his job and that he developed a cough, shortness of breath, and wheezing for the first time in his life while working at the Permatech facility. Plaintiff further reported that he began to produce black nasal and chest mucus and was not given a respirator for several months.

12.     Plaintiff underwent pulmonary function testing, which revealed moderate airflow obstruction. This condition was capable of reversal with a bronchodilator. Based upon his examination and the testing, Dr. McQuaid was of the opinion that Plaintiff had asthma. Plaintiff reported experiencing seasonal allergies and Dr. McQuaid recommended allergy testing, but Plaintiff declined. According to Dr. McQuaid, it is important to understand any allergies an asthmatic person may have because "if you're allergic to something and you have asthma, it can make the asthma symptoms worse."

13.     In response to a letter from Plaintiff's counsel dated April 20, 2015, Dr. McQuaid opined that Plaintiff's condition was caused by the substances he was exposed to at the Permatech facility. However, there is no description of all of the substances and the letter indicates plaintiff did not use a breathing device. Dr. McQuaid could not remember seeing any additional documentation setting out the specific substances used at the Permatech facility. Dr.

McQuaid did not review material data safety sheets of the chemicals Plaintiff worked with and did not review Permatech's dust sampling results in conjunction with his evaluation and diagnosis of Plaintiff. Dr. McQuaid was not familiar with the types of respiratory masks used at the Permatech facility and used by Plaintiff. Dr. McQuaid testified that his understanding was that plaintiff "was exposed to some black stuff."

14. When Dr. McQuaid testified by deposition, he initially opined, to a reasonable degree of medical certainty, that Plaintiff's asthma was very likely caused by his environmental exposure at the Permatech facility. However, Dr. McQuaid did not know that Plaintiff had smoked cigarettes after 2005, did not know that Plaintiff had complained of wheezing in 2007 and 2008, and did not know that Plaintiff wore a respirator mask during the entirety of his employment at the Permatech facility. Dr. McQuaid ultimately testified that a different history might affect his opinions on causation, and that Plaintiff's smoking at work after 2005 would be a different history than the one Plaintiff gave him.

15. On September 29, 2015, Dr. Dennis Darcey conducted an independent medical examination of Plaintiff at the request of Defendants Debbie's Staffing, Inc., and NCIGA. Dr. Darcey is an expert in occupational and environmental medicine, industrial hygiene, and epidemiology and is currently the Division Chief of Occupational and Environmental Medicine at Duke University and the Medical Director of Duke's Occupational Medicine Clinic. In addition to reviewing Plaintiff's medical records, Dr. Darcey reviewed the material safety data sheets and Permatech's dust sampling results in conjunction with his evaluation of Plaintiff. Dr. Darcey noted Plaintiff's past history of allergic reaction to cats, smoking cigarettes and marijuana, and inhalant abuse.

16.     After ordering a high resolution CT examination and pulmonary function studies, Dr. Darcey concluded that Plaintiff suffers from a mild to moderate case of asthma.  Dr. Darcey explained that asthma occurs when the airways become irritated and inflamed, and that reactions can be triggered by any number of things. However, irritant dust does not generally cause new onset asthma; it is more typically associated with an aggravation of a preexisting airway hyperreactivity.  With regard to Plaintiff specifically, Dr. Darcey testified that, based on the history of smoking and allergic responses, Plaintiff had a reactive airway before he began working at the Permatech facility, and that Plaintiff's exposure to dust at Permatech could have aggravated his preexisting reactive airway/asthma condition.

17.     Based upon a preponderance of the evidence in view of the entire record, the Full Commission finds that Plaintiff's employment was a significant contributing factor in his development of asthma, to the extent that his exposure to irritant dust aggravated but did not cause his asthma.

18.     Neither Dr. McQuaid nor Dr. Darcey testified that Plaintiff's employment placed him at an increased risk of *contracting,* as opposed to aggravating, asthma as compared to members of the general public not so employed.  During Dr. Darcey's deposition, Plaintiff's counsel introduced two articles which summarized studies of silicon carbide protection workers in Norway and Romania.  The articles are based upon exposure to dust in facilities where silicon carbine is made and there is no evidence that this was similar to the dust exposure at the Permatech facility.  The level of silicon carbide-containing dust in the studies was significantly higher than the levels documented at Permatech, and significantly higher than what Plaintiff could have possibly been exposed to with his P95 respirator/mask.  According to one article, the study was conducted in a Romanian silicon carbide production facility where "the overall level of pollution was

exceptionally high" and the measurement of total dust in the air was "more than 50 times the maximum level permitted in Romania." Furthermore, the articles do not indicate whether the workers wore respiratory protection at work. These articles do not support a finding that Plaintiff's employment placed him at an increased risk of contracting asthma.

After setting out its findings of fact, the Commission then made conclusions of law stating, in relevant part, as follows:

> 4. In order to satisfy the remaining two prongs of the *Rutledge* test, Plaintiff was required to present competent medical evidence that his exposure to alumina silicate, cement (calcium aluminate), cristobalite, quartz, fused silica, fumed silica, silicon carbine alumina, and other dusts placed him at a greater risk than the general public of contracting asthma. . . .
>
> 5. Plaintiff has failed to prove through competent expert opinion evidence that his employment at the Permatech facility placed him at an increased risk of contracting asthma than the general public. . . .

The only one of the Commission's findings of fact challenged by Briggs in this appeal is Finding No. 6. Thus, because the remainder of the Commission's findings of fact are unchallenged, they are binding on appeal. *See Allred v. Exceptional Landscapes, Inc.*, 227 N.C. App. 229, 232, 743 S.E.2d 48, 51 (2013) ("Unchallenged findings of fact are presumed to be supported by competent evidence and are binding on appeal." (citation omitted)).

The interplay between the three prongs of the *Rutledge* test was explained by this Court in *Futrell*. In *Futrell*, the employee filed a workers' compensation claim

contending that he had contracted carpal tunnel syndrome as a result of his employment as a resin kettle operator. He testified that his job responsibilities required him to "tear[ ] open fifty-pound bags of chemicals with his hands, us[e] an axe to bang on drums to loosen their contents, and monitor[ ] kettles." *Futrell*, 151 N.C. App. at 457, 566 S.E.2d at 182.

The defendants presented testimony from an orthopedic surgeon who testified that the "plaintiff's employment did not place him at a greater risk for developing carpal tunnel syndrome than the general public." *Id.* at 459, 566 S.E.2d at 183. The Commission determined that "neither of plaintiff's treating physicians, Drs. Vernon Kirk and Anthony DiStasio, offered evidence that plaintiff's job placed him at an increased risk for development of the disease as compared to the employment population at large." *Id.* Based on its findings, the Commission concluded that the plaintiff had failed to establish that his carpal tunnel syndrome was compensable because he had not satisfied the first two prongs of the *Rutledge* test. *Id.* at 458, 566 S.E.2d at 183.

We affirmed the Commission's decision, ruling that its findings were supported by competent evidence and supported its conclusions of law. In our opinion, we stated the following:

> . . . [T]here is no authority from this State which allows us to ignore the well-established requirement that a plaintiff seeking to prove an occupational disease show that the employment placed him at a greater risk for

*contracting* the condition, even where the condition may have been aggravated but not originally caused by the plaintiff's employment. We cannot agree with the dissent's position that this reading of *Rutledge* effectively precludes recovery in all cases where a claimant does not argue that his employment caused him to contract the disease. It simply precludes recovery where a claimant cannot meet all three well-established requirements for proving an occupational disease. This is not a novel approach or reading of *Rutledge*.

Indeed, if the first two elements of the *Rutledge* test were meant to be altered or ignored where a claimant simply argued aggravation or contribution as opposed to contraction, then our courts would not have consistently defined the third element of the *Rutledge* test as being met where the claimant can establish that the employment caused him to contract the disease, *or* where he can establish that it significantly contributed to or aggravated the disease. . . . *Rutledge* and subsequent case law applying its three-prong test make clear that evidence tending to show that the employment simply aggravated or contributed to the employee's condition goes only to the issue of causation, the third element of the *Rutledge* test. Regardless of how an employee meets the causation prong (i.e., whether it be evidence that the employment caused the disease or only contributed to or aggravated the disease), the employee must nevertheless satisfy the remaining two prongs of the *Rutledge* test by establishing that the employment placed him at a greater risk for contracting the condition than the general public.

*Id.* at 460, 566 S.E.2d at 184 (internal citations omitted).

Here, the Commission concluded that Briggs had satisfied the third prong of the *Rutledge* test by showing that the conditions at the Permatech facility aggravated his asthma, and this determination is not in dispute. Rather, the key question in this

appeal is whether Briggs has likewise satisfied the first two prongs of the *Rutledge* test.

Briggs asserts that he provided sufficient evidence to demonstrate that his conditions of employment increased his risk of contracting asthma as compared with the general public. Specifically, he contends that the evidence he presented in the form of lay testimony and articles — coupled with basic notions of "common sense" — was sufficient to meet his burden of proof. Defendants, conversely, argue that Briggs was required to produce expert medical evidence in order to establish that his employment conditions placed him at a greater risk for contracting asthma. In order to analyze this issue, we find it instructive to review the relevant case law from our appellate courts applying *Rutledge*.

*Norris v. Drexel Heritage Furnishings, Inc.*, 139 N.C. App. 620, 534 S.E.2d 259 (2000), *cert. denied*, 353 N.C. 378, 547 S.E.2d 15 (2001), involved a worker who brought a claim for workers' compensation benefits based on her allegations that her employment as a splicing machine operator had caused her fibromyalgia. *Id.* at 622, 534 S.E.2d at 261. The plaintiff offered the testimony of a specialist in chronic pain management who had diagnosed her with myofascial pain syndrome. He "indicated a causal relation existed between plaintiff's condition and her employment." *Id.* at 621-22, 534 S.E.2d at 261. Several other medical specialists with whom the plaintiff had consulted stated that they had diagnosed her disease as fibromyalgia. *Id.* at 622,

534 S.E.2d at 261. Additionally, three of the plaintiff's co-workers testified that "they experienced similar burning sensation and knots in their upper backs and shoulders as a result of performing the job." *Id.* at 622, 534 S.E.2d at 261.

The Commission found that "the plaintiff had fibromyalgia and that her fibromyalgia was caused or aggravated by her employment with the defendant." *Id.* However, because the Commission concluded that "there was no medical evidence that plaintiff's employment with defendant placed her at an increased risk of contracting or developing fibromyalgia as compared to the general public not so employed," it concluded that her fibromyalgia was not an occupational disease. *Id.*

We affirmed the Commission's decision, stating as follows:

> Plaintiff . . . contends that the Commission acted under a misapprehension of law by requiring medical evidence to prove plaintiff's employment subjected her to a greater risk of developing fibromyalgia than the general public not so employed. We disagree.
>
> . . . . [W]ith regard to the necessity of proof by expert medical testimony, our Supreme Court has stated that where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. . . . It has also stated that when a layman can have no well-founded knowledge and can do no more than indulge in mere speculation (as to the cause of a physical condition), there is no proper foundation for a finding by the trier without expert medical testimony. . . . Therefore, findings regarding the nature of a disease—its characteristics, symptoms, and

manifestations—must ordinarily be based upon expert medical testimony.

*Id.* at 622-23, 534 S.E.2d at 262 (internal citation and quotation marks omitted).

In *Chambers v. Transit Mgmt.*, 360 N.C. 609, 636 S.E.2d 553 (2006), the employee sought workers' compensation benefits for a left ulnar nerve entrapment affecting his elbow and a cervical spine condition affecting his neck. He alleged that these conditions were caused by his occupation as a bus driver. *Id.* at 610, 636 S.E.2d at 554.

The plaintiff offered testimony from Dr. Tim Adamson, a neurosurgeon who diagnosed him with a "double crush syndrome" and helped describe the relationship between the two injuries. *Id.* at 611, 636 S.E.2d at 554. Dr. Adamson also wrote a letter to the plaintiff's attorney in which he stated that "plaintiff's occupation as a bus driver did place him slightly at higher risk than the general public." *Id.* at 614, 636 S.E.2d at 556. At his deposition, he clarified the statements in his letter by testifying that he was "not able to say that the bus driving activities caused the ulnar neuropathy, but that it could have aggravated the ulnar neuropathy[.]" *Id.* at 615, 636 S.E.2d at 557. Based on Dr. Adamson's opinions, the Commission found that both of the plaintiff's injuries were compensable occupational diseases. *Id.* at 611, 636 S.E.2d at 554.

The Supreme Court reversed the Commission's award and held that the "plaintiff ha[d] failed to establish that his employment placed him at a greater risk

of contracting either his ulnar nerve entrapment or his cervical spine condition than the general public." *Id.* at 614, 636 S.E.2d at 556. The Court focused its analysis on the medical evidence presented by the plaintiff, holding that even though Dr. Adamson's letter stated that the plaintiff was "at higher risk than the general public[,]" the letter did not "satisfactorily distinguish between the risk faced by plaintiff of *contracting* his conditions and the risk of *aggravating* a preexisting condition relative to the general public[.]" *Id.* at 614-15, 636 S.E.2d at 556. Thus, the Court concluded that the plaintiff had not met his burden of establishing through expert medical evidence that his employment placed him at a greater risk than members of the general public of contracting the diseases. *Id.* at 615, 636 S.E.2d at 556.

Briggs does not dispute the proposition that he was required to satisfy the first two prongs of the *Rutledge* test by showing that his employment at Permatech exposed him to a greater risk of contracting asthma than the general public. Instead, he contends that North Carolina courts have never expressly required expert medical evidence to establish the first two prongs of the *Rutledge* test. However, based on our careful reading of *Norris* and *Chambers*, we conclude that our case law has, in fact, consistently required that such evidence be produced in order for these two prongs to be met. *See Thomas v. McLaurin Parking Co.*, 181 N.C. App. 545, 551, 640 S.E.2d 779, 783 (2007) (affirming denial of benefits where "[n]o evidence was presented by

either doctor presenting testimony to the Commission that plaintiff's employment placed him at a greater risk for contracting degenerative arthritis").[1]

The Commission's unchallenged findings of fact fully support its conclusion that Briggs failed to offer sufficient medical evidence that the conditions at the Permatech facility placed him at a greater risk for contracting asthma than the general public. In Finding No. 17, the Commission found that "Plaintiff's employment was a significant contributing factor in his development of asthma, to the extent that his exposure to irritant dust aggravated but did not cause his asthma." In Finding No. 18, the Commission found that "[n]either Dr. Darcey nor Dr. McQuaid testified that Plaintiff's employment placed him at an increased risk of *contracting,* as opposed to aggravating, asthma as compared to members of the general public not so employed." Moreover, as the Commission also noted, Dr. Darcey testified that "asthma occurs when the airways become irritated and inflamed, and that reactions can be triggered by any number of things" but that "irritant dust does not generally cause new onset asthma . . . ."

Briggs also argues that the Commission erred by failing to determine that the two articles he submitted during Dr. Darcey's deposition supported a finding that his

---

[1] While Briggs attempts to rely on *Caulder v. Waverly Mills*, 314 N.C. 70, 331 S.E.2d 646 (1985), that case is inapposite. The issue in *Caulder* was not whether the plaintiff's employment placed him at a greater risk than the general public of contracting his disease for purposes of the *Rutledge* test. Rather, the question in *Caulder* involved the entirely separate issue of whether the defendants' employment was the plaintiff's "last injurious exposure" to the hazards of the disease from which the plaintiff suffered. *Id.* at 72, 331 S.E.2d at 647 (emphasis added).

job at Permatech placed him at an increased risk of contracting asthma. As an initial matter, these articles are not an adequate substitute for expert medical evidence on this issue. Furthermore, we note that the Commission made an unchallenged finding that these articles — which detailed studies of silicon carbide effects on workers in factories in Norway and Romania — involved working environments in which the amounts of silicon carbide were significantly higher than those at the Permatech facility. The Commission also found that the articles did not specify whether the workers in the study wore respiratory masks for protection as did the workers in the Permatech facility.

In his final argument, Briggs contends that expert medical evidence was not required under the circumstances of this case to establish the first two prongs of the *Rutledge* test because the facts here did not involve complex questions of science so much as "common sense." He argues that "[t]he average person is not exposed to 108 tons of asthma-causing dust" and asserts that any layperson would know that working in a dusty environment exposes a worker to an increased risk of contracting asthma.

We are unable to agree with Briggs that the question of whether an individual can actually *contract* asthma simply by working in a dusty environment is one that a layperson could answer. Rather, we believe such a determination is beyond a layperson's understanding given that questions as to the root causes of asthma can

only be answered by medical experts.[2]  *See Norris*, 139 N.C. App. at 622-23, 534 S.E.2d at 262 (holding that "when a layman can have no well-founded knowledge and can do no more than indulge in mere speculation (as to the cause of a physical condition), there is no proper foundation for a finding by the trier without expert medical testimony").

Thus, Briggs failed to establish that "[his] employment exposed [him] to a greater risk of contracting [asthma] than the public generally . . . ." *Rutledge*, 308 N.C. at 93-94, 301 S.E.2d at 365 (citation omitted).  Accordingly, the Commission properly denied his claim.

## Conclusion

For the reasons stated above, we affirm the Commission's 31 March 2017 Opinion and Award.

AFFIRMED.

Judges TYSON and BERGER concur.

---

[2] We observe that Briggs' "common sense" argument stands in stark contrast to Dr. Darcey's testimony that asthma is generally *not* caused by irritant dust.